UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 4:14-cv-00783-DW |
| Plaintiff, | |
| v. | |
| CWB SERVICES, LLC, *et al.,* | |
| Defendants. | |

## RECEIVER'S MOTION FOR TURNOVER OF PROPERTY OF THE RECEIVERSHIP ESTATE TRANSFERRED TO DNA INVESTMENTS, LLC, DAVID A. HARBOUR AND ABBY HARBOUR

Larry E. Cook ("Receiver"), by and through his undersigned counsel, for his Motion for Turnover of Property of the Receivership Estate Transferred to DNA Investments, LLC, David A. Harbour, and Abby Harbour (the "Motion"), respectfully states as follows:

### Introduction and Summary

1.     The Federal Trade Commission ("FTC") initiated this enforcement action on September 5, 2014 by filing its Complaint (Docket No. 3).

2.     On September 9, 2014, the Court entered its *Ex Parte* Temporary Restraining Order With an Asset Freeze, Appointment of a Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Order Appointing Receiver") (Docket No. 7).

3.     On September 23, 2014, the Court entered its Order Entering Stipulated Preliminary Injunction with an Asset Freeze, Appointment of a Receiver, and other Equitable Relief (the "PI Order") (Docket No. 34).

4.     The PI Order provides the Receiver is directed and authorized to take exclusive

23606754v3

custody, control, and possession of all assets of the Receivership Defendants, wherever situated. *See* PI Order, ¶ XII.B, Page 15. The PI Order also provides that the Receiver is directed and authorized to institute proceedings the Receiver deems necessary and advisable to recover assets of the Receivership Defendants. *Id.* at ¶ XII.L, Page 18, . The PI Order further provides that any person or entity with knowledge of the PI Order shall transfer to the Receiver all assets of the Receivership Defendants. *Id.* at ¶ XIV.A.1, Page 23.

5. In the instant Motion, the Receiver seeks a turnover order directing DNA Investments, LLC ("DNA"), DNA's sole member, David A. Harbour, and his wife, Abby Harbour (David and Abby Harbour together the "Harbours") to return $6,612,762 transferred by Receivership Defendant Canyon Road Holdings, LLC ("Canyon Road") first to DNA, and then to the Harbours, between April 2011 and July 2014.

6. The Court has broad equitable powers, not only to impose a receivership, but also to direct the return of proceeds of the underlying fraud under a constructive trust theory (from a non-party regardless of whether that non-party committed any wrong doing, simply by showing the non-party has been unjustly enriched) or a fraudulent transfer theory (from a non-party who received proceeds of the underlying fraud for less than reasonably equivalent value or who received the proceeds with intent of hindering creditors).

7. DNA and the Harbours were unjustly enriched by, and have failed to return reasonable equivalent value for, the funds they received from the Receivership Defendants. The Receiver has demanded the return of the funds from DNA and the Harbours, but DNA and the Harbours failed and refuse to return the Receivership asset. Accordingly, the Receiver seeks the Court's Order directing DNA and the Harbours to return $6,612,762 they received from the Receivership Defendants.

2

## Facts and Background

8. DNA is a Delaware LLC organized by David Harbour on or about August 30, 2010.

9. David Harbour is the sole member of DNA.

10. Abby Harbour is David Harbour's spouse.

11. As set forth in the Receiver's Notice of Additional Receivership Defendants (Docket No. 149), Canyon Road is a Kansas limited liability company formed on or about January 26, 2011 by Defendant Frampton T. Rowland, III ("Rowland") and DNA.

12. Canyon Road is owned 66.7% by DNA and 33.3% by Rowland.

13. The Canyon Road Operating Agreement states the purpose of Canyon Road is engaging in the business of marketing, collecting and making fee based loans.

14. Through his investigation and due diligence into Canyon Road's finances, the Receiver has determined Canyon Road's primary purpose was to raise capital from individual investors to fund the consumer payday loans made by the following corporate defendants in this case:: Longboat Group, LLC d/b/a Cutter Group ("Longboat"), St. Armands Group, LLC ("St. Armands"), Anasazi Group, LLC ("Anasazi"), Oread Group LLC d/b/a Mass Street Group ("Oread"), and Vandelier Group LLC ("Vandelier") (collectively, the "DNA/Rowland Lending Entities").

15. The DNA/Rowland Lending Entities are each owned 66.7% by DNA and 33.3% by Rowland.

16. The DNA/Rowland Lending Entities received capital from Canyon Road, made consumer loans, serviced and collected consumer loans plus interest and fees, and paid some of the cash generated from their consumer lending operations to Canyon Road. Canyon Road, in turn, made transfers to its investors and also made distributions to its owners, DNA and

3

Rowland.

17.     Canyon Road was a pass-through entity which received the cash generated from the corporate defendants' consumer lending scheme leaving the DNA/Rowland Lending Entities insolvent.

18.     Between 2011 and 2014, Canyon Road collected in excess of $19 million in purported management fees from the DNA/Rowland Lending Entities as follows[1]:

|  | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|
| Revenues |  |  |  |  |  |
| Fee Longboat | $ 351,500.00 | $ 2,019,500.00 | $ 1,668,065.59 | $ (564,421.53) | $ 3,474,644.06 |
| Fee St Armands | $ 633,500.00 | $ 2,039,000.00 | $ 1,323,960.29 | $ - | $ 3,996,460.29 |
| Fees Anasazi Group | $ - | $ 1,526,500.00 | $ 1,874,756.12 | $ - | $ 3,401,256.12 |
| Fees Oread | $ 207,000.00 | $ 1,269,000.00 | $ 1,246,007.08 | $ (266,063.18) | $ 2,455,943.90 |
| Fees Vandelier | $ 480,000.00 | $ 2,031,000.00 | $ 1,678,499.11 | $ (550,526.97) | $ 3,638,972.14 |
| Collections | $ - | $ - | $ - | $ 1,481,565.12 | $ 1,481,565.12 |
| Income Viking | $ - | $ - | $ 1,004,691.60 | $ - | $ 1,004,691.60 |
|  |  |  |  |  |  |
| Total Revenues | $ 1,672,000.00 | $ 8,885,000.00 | $ 8,795,979.79 | $ 100,553.44 | $ 19,453,533.23 |

19.     The DNA/Rowland Lending Entities, in turn, derived their profits from collecting the misleading and impermissible consumer payday loans as set forth in the FTC's Complaint.

20.     To briefly recap, the FTC's Complaint alleged the Defendants (including the DNA/Rowland Lending Entities): (i) made numerous payday loans to consumers who had not authorized the payday loan and/or had not authorized the Defendants to make withdrawals from their bank accounts (the "Autofunded Payday Loans"); (ii) misrepresented or failed to disclose the cost of the payday loans prior to funding such loans (the "Cost/Fee Misrepresented Loans");

---

[1] The following table is taken from unaudited income statements prepared for Canyon Road by its pre-receivership CPA.

23606754v3

and (iii) conditioned the extension of credit on recurring preauthorized electronic fund transfers (the "ACH-Conditioned Loans"). In many cases, a consumer payday loan made by the DNA/Rowland Lending Entities met all three of these violations.

21.     The Receiver has confirmed the FTC's allegations in the Complaint as follows:

      a.     As to the Cost/Fee Misrepresented Loans and ACH-Conditioned Loans, the Defendants, including the DNA/Rowland Lending Entities, obtained the consumer payday loan forms from eData, the same entity which sold the DNA/Rowland Lending Entities "leads" for new consumer payday loans. The payday loan forms reviewed by the Receiver misrepresented the cost of the loans and conditioned the extension of credit on recurring preauthorized electronic fund transfers. To be clear, the DNA/Rowland Lending Entities had in excess of one million payday loan applicants, issued in excess of 350,000 consumer loans to over 325,000 consumers--- hence the Receiver has <u>not</u> reviewed every single consumer loan. Nevertheless, based upon the documents reviewed and statements made by the individual defendants, the Receiver believes all of the consumer payday loans made by the DNA/Rowland Lending Entities between 2011 and 2014 were either Cost/Fee Misrepresented Loans and/or ACH-Conditioned Loans.

      b.     As to the Autofunded Payday Loans, the Receiver has reviewed numerous e-mails, voicemails, and other documents to confirm the FTC's allegations that a significant number of the loans made by the DNA/Rowland Lending Entities were Autofunded Payday Loans which the consumer did not

5

authorize and did not accept the terms of the loan. By reviewing the loan management software data for the DNA/Rowland Lending Entities, the Receiver has confirmed these entities "autofunded" between 19.5% and 27.6% of their consumer payday loans. The Receiver's review of the financials for the DNA/Rowland Lending Entities, as set forth below, shows the autofunded loans generated 40% of their gross profit. Although autofunded loans were a small portion of the total loans, the autofunded loans generated proportionately greater gross profit than non-autofunded loans.

22. To provide a sense of the scope and activity by the DNA/Rowland Lending Entities, the following is a snapshot of the DNA/Rowland Lending Entities' consumer lending activity between 2011 and 2014[2]:

| Funding Company | Number of Consumers | Number of Loans | Total Loan Amount | Total Payments Received from Consumers | Gross Profit |
|---|---|---|---|---|---|
| Longboat d/b/a Cutter | 58,140 | 62,582 | $15,802,450.00 | $25,200,391.00 | $9,397,941.00 |
| St. Armands | 60,870 | 65,511 | $16,320,000.00 | $23,750,222.00 | $7,430,222.00 |
| Ansazi | 60,028 | 73,631 | $18,472,500.00 | $26,068,728.00 | $7,596,228.00 |
| Oread d/b/a Mass Street | 49,941 | 53,336 | $13,505,900.00 | $20,449,210.00 | $6,943,310.00 |
| Vandelier | 54,943 | 59,496 | $14,935,850.00 | $23,448,248.00 | $8,512,398.00 |
| | | | | | $39,880,099.00 |

23. To provide a sense of the scope and activity by the DNA/Rowland Lending

---

[2] The following two tables summarize data extracted from the DNA/Rowland Lending Entities loan management software and do not reflect purported operational expenses of the DNA/Rowland Lending Entities—only the number of consumers, number of loans (some consumers had more than one loan) total loans made to consumers and total payments by consumers. The dollar figures between the DNA/Rowland Lending Entities' financial statements and the loan management software may not match precisely due to timing of recognition of loans made and payments received.

6

23606754v3

Entities' loans to consumers **solely on account of Autofunded Payday Loans**, the following is

a snapshot of the Autofunded Payday Loans to consumers:

| Funding Company | Number of Consumers | Number of Loans | Total Loan Amount | Total Payments Received from Consumers | Gross Profit |
|---|---|---|---|---|---|
| Longboat d/b/a Cutter | 16,526 | 14,728 | $3,958,500.00 | $7,723,193.00 | $3,764,693.00 |
| St. Armands | 14,750 | 15,950 | $3,955,250.00 | $7,007,544.50 | $3,052,294.50 |
| Ansazi | 13,364 | 14,431 | $3,630,500.00 | $6,100,172.00 | $2,469,672.00 |
| Oread d/b/a Mass Street | 13,737 | 14,744 | $3,697,900.00 | $6,971,045.50 | $3,273,145.50 |
| Vandelier | 13,769 | 15,042 | $3,754,400.00 | $7,198,461.00 | $3,444,061.00 |
| | | | | | $16,003,866.00 |

24.     To summarize, between 2011 and 2014, the DNA/Rowland Lending Entities

realized a gross profit of nearly $40 million from consumers (total loan payments collected less

total loans made), of which $16 million was on account of Autofunded Payday Loans. During

this same time period, the DNA/Rowland Lending Entities paid Canyon Road over $19 million

in fees.

25.     Canyon Road, in turn, transferred in excess of $6.6 million to DNA between 2011

and 2014 in the form of owner distributions. A true and correct accounting of the transfers made

to DNA is attached hereto as **Exhibit A**.

26.     The Receiver has reviewed the DNA bank account into which the $6.6 million

from Canyon Road was transferred and found numerous instances of the Harbours using the

funds for personal expenses.

27.     Abby Harbour was an authorized signer on the DNA bank account. Between 2011

and 2014, Abby Harbour regularly wrote checks to herself for over $100,000 from the DNA

bank account. Abby Harbour also wrote checks from the DNA bank account for apparent

personal expenses such as one check for $45,000 to a studio with a memo of "Bday Deposit."

23606754v3

28.     David Harbour was an authorized signer on the DNA bank account. Between 2011 and 2014 David Harbour wrote checks from the DNA bank account totaling millions of dollars to purchase property in Mexico and elsewhere, for golf memberships, private jet charter, transfers to another David Harbour business, High Pointe Capital Management, LLC and other personal expense items. David Harbour also issued checks on the DNA bank account to trusts and individuals whom the Receiver recognizes as investors in other DNA/Rowland Lending Entities. A sample of the person expense transfers is as follows:

   a.     $1.3 million for private jet charters.

   b.     Nearly $3 million in internal bank transfers, checks to cash, and distributions to David and Abby Harbour.

   c.     Nearly $2 million for real property expenses and club memberships in Cabo, Mexico; Coueur D'Arlene, ID; and Scottsdale, AZ.

   d.     $300,000 for interior designer.

   e.     Nearly $300,000 to "The Ticket Exchange."

29.     The DNA bank account into which the $6.6 million from Canyon Road was transferred was not used as a separate corporate account but rather a personal expense account by the Harbours.

## Authorities and Argument

30.     Federal courts inherently have broad equitable power enabling them to issue a variety of ancillary relief necessary to grant full relief which goes beyond the parties before the court. *See Ritchie v. Capital Mgmt., L.L.C. v. Jeffries,* 653 F.3d 755, 762 (8th Cir. 2011) (citing *SEC v. Wencke,* 622 F.2d 1363, 1369–71 (9th Cir. 1980); *see also SEC v. Blatt,* 583 F.2d 1325 (5th Cir. 1978); *SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1103-04 (2d Cir. 1972). Federal courts seeking to enforce the public interest especially have broad equitable powers to shape equitable remedies to grant full relief depending on the particular case. *See Matter of E.C. Bishop*

8

& Son, Inc., 32 B.R. 534, 537 (Bankr. W.D. Mo. 1983) (citing *SEC v. Wencke*, 622 F.2d 1363, 1371 (9th Cir. 1980)). Federal common law of receivership recognizes the broad equitable powers of an equity receivership to take possession and ultimately sell property obtained by fraud even though it may impact the rights of innocent parties. *SEC v. Am. Capital. Invs., Inc.*, 98 F.3d 1133, 1145 (9th Cir. 1996), *abrogated on different grounds*, 523 U.S. 83 (1998).

31.     Included within the federal court's authority to grant ancillary relief is the power to impose a receivership. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1021 (N.D. Ind. 2000) (citing *FTC v. American Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512–13, 1514 (9th Cir.1987); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432–33 (11th Cir. 1984); *FTC v. Windermere Big Win Int'l* [1999–2 Trade Cases ¶ 72,647], No. 98C8066, 1999 WL 608715, at * 1 (N.D. Ill. Aug.5, 1999); *Slimamerica*, 77 F. Supp. 2d 1263, 1277 (S.D. Fla. 1999); *FTC v. Wilcox*, 926 F. Supp. 1091, 1106 (S.D. Fla. 1995); *FTC v. Int'l Computer Concepts* [1994–2 Trade Cases ¶ 70, 798], No. 94CV1678, 1994 WL 730144, at * 17 (N.D. Ohio Oct. 24, 1994); *c.f. Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt.*, 713 F.2d 1477, 1480, 1482 (10th Cir. 1983) (receiver may be directed to take custody and control of all assets and records, to prevent further dissipation of assets, and to prosecute and defend court actions).

32.     In addition to the power to impose a receivership, a federal court may obtain equitable relief against a non-party regardless of whether that non-party committed any wrongdoing. A court may direct that all of the proceeds of the fraud be paid to the receiver to preserve the status quo for the benefit of the defrauded consumers. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1022 (N.D. Ind. 2000) (holding that it would be inequitable to allow any party to obtain or retain proceeds from a fraudulent scheme, and that, equities requires

9

a court to form a constructive trust for the benefit of the defrauded parties and disgorge the unjustly enriched parties of the proceeds of the fraudulent scheme).

33.     Furthermore, a court may order non-parties to turn over receivership assets to the Receiver. *FTC v. Neiswonger*, 2009 WL 2998356, *3 (E.D. Mo. Sept. 15, 2009) (citing *FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001)); *FTC v. Transcon. Warranty, Inc.*, 2009 WL 5166213, *2 (N.D. Ill. Dec. 22, 2009) ("[d]istrict courts routinely enforce [orders requiring non-parties to turn over receivership assets to the Receiver] in conjunction with lawsuits filed by government agencies on behalf of injured consumers"). A court can obtain equitable relief to recover ill-gotten gains for the benefit of the victims of the wrongdoing, whether those ill-gotten gains are "'held by the original wrongdoer or by one who has received the proceeds after the wrong[,]'" simply by showing that the non-party has possession of the ill-gotten funds and has no legitimate claim to them. *FTC. v. Ivy Capital, Inc.*, 2013 WL 1224613, *18 (D. Nev. Mar. 26, 2013) (quoting *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)); *see also SEC v. Cherif*, 933, F.2d 403, 414, n. 11 (7th Cir. 1991).

34.     The Receiver is entitled to recover the $6,612,762.39 transferred from Canyon Road to DNA and the Harbours under two theories. The first is constructive trust. *Liken v. Shaffer*, 141 F.2d 877, 880-81 (8th Cir. 1944) (holding that a constructive trust is imposed where, rightfully or wrongfully, a party obtains or retains property that unjustly enriches him, even if the party obtaining or retaining the property does nothing wrongful); *see also Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008 (8th Cir. 2004) (holding that "[a] constructive trust is imposed when a defendant has possession of particular funds or property that in good conscience belong to the plaintiff"); *In re McGehee*, 342 B.R. 587, 591 (Bankr. W.D. Mo. 2006 (holding that unjust enrichment alone is a valid basis for the imposition of a constructive trust in Missouri)

10

(citing *Brown v. Brown*, 152 S.W.3d 911, 916-17 (Mo. Ct. App. 2005); *Rollins v. Metro. Life Ins. Co.*, 863 F.2d 1346, 1354 (7th Cir. 1988) ("a constructive trust may be invoked even where the unjustly enriched party is completely blameless), *overruled on other grounds*, 979 F.2d 575 (7th Cir. 1992).

35.     In this case, the Court should exercise its equitable powers to establish a constructive trust over the nearly $40 million in gross profits realized by the DNA/Rowland Lending Entities between 2011 and 2014 of which over $19 million was paid to Canyon Road, which in turn paid $6.6 million to DNA and the Harbours.  No wrongdoing by DNA or the Harbours is alleged or required to impose a constructive trust and order the return of these funds to the receivership estate.  As alleged by the FTC and confirmed by the Receiver, the defendants in this case, including the DNA/Rowland Lending Entities, engaged in deceptive consumer payday lending activity.  The $6.6 million ultimately received by DNA and the Harbours are proceeds of the fraudulent consumer lending activity.  DNA and the Harbours have no legitimate claim to these proceeds.  The Court should order DNA and the Harbours to return these funds to the receivership estate.

36.     The second theory entitling the Receiver to recover the $6.6 million from DNA and the Harbours is the applicable fraudulent transfer statutes. *See, e.g., Fleming Cos., Inc. v. Rich*, 978 F. Supp. 1281, 1296 (E.D. Mo. 1997).  Under fraudulent transfer statutes, a transfer is set aside when it is made with actual intent to hinder, delay, or defraud any creditor, or is made for less than reasonably equivalent value in exchange for the transfer. *Id.* at 1294, 1299.

37.     The Court should exercise its equitable powers to order DNA and the Harbours to return the $6.6 million they received from the DNA/Rowland Lending Entities as a fraudulent transfer.  DNA and the Harbours failed to provide reasonably equivalent value for the $6.6

11

23606754v3

Case 4:14-cv-00783-DW   Document 150   Filed 03/31/15   Page 11 of 13

million in transfers they received. From the Receiver's review of the DNA/Rowland Lending Entities' and Canyon Road's finances, DNA and the Harbours simply took $6.6 million from the proceeds of the consumer lending scheme as owner distributions without providing any value in return.

38.     Summary proceedings are appropriate for turnover actions where the respondents are "provided all procedural rights and safeguards to which they are entitled pursuant to the Federal Rules of Civil Procedure." *U.S. Commodities Futures Trading Comm'n v. Cook*, 2011 WL 2160283, *4 (D. Minn. Apr. 22, 2011); *see also SEC v. Am. Capital. Invs., Inc.*, 98 F.3d 1133, 1146 (9th Cir. 1996) (holding that "[f]or the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard"), *abrogated on different grounds*, 523 U.S. 83 (1998); *SEC v. Universal Fin.*, 760 F.2d 1034, 1037 (9th Cir. 1985) (rejecting the requirement of plenary proceedings where the lower court afforded the interested parties all of the procedural protections that would have been available in a plenary proceeding, i.e. discovery, filing briefs and exhibits, and the application of the Federal Rules of Evidence and Civil Procedure).

## Conclusion

39.     The $6.6 million DNA and the Harbours extracted from Canyon Road between 2011 and 2014 represents proceeds of the consumer lending fraud alleged by the FTC in the Complaint. As such, the $6.6 million transfer to DNA and the Harbours was an unjust enrichment of DNA and the Harbours at the expense of the defrauded consumer borrowers. The Court should impose a constructive trust on the funds received by DNA and the Harbours and they should be ordered to return the funds to the Receiver as property of the Receivership Estate. Alternatively, the Court should find DNA and the Harbours should return the transferred funds because they provided the Receivership Defendants, including Canyon Road and the

12

DNA/Rowland Lending Entities, less than reasonably equivalent value for the $6.6 million extracted from the Receivership Defendants.

WHEREFORE, the Receiver respectfully requests the Court enter an Order:

(i)     Directing DNA Investments, LLC, David A Harbour, and Abby Harbour, jointly and severally, to immediately turnover the sum of $6,612,762.39 to the Receiver;

(i)     An Order of Judgment against DNA Investments, LLC, David A Harbour, and Abby Harbour, jointly and severally, in the amount of $6,612,762.39 in favor of the Receiver; and

(iii)    For such other and further relief as the Court deems just and appropriate.

Dated: March 31, 2015

Respectfully submitted,

LATHROP & GAGE LLP

By: /s/ *Brian M. Holland*
Brian M. Holland  MO # 51307
2345 Grand Blvd, Suite 2400
Kansas City, MO 64108
Telephone: 816.292.2000
Telecopier: 816.292.2001
Email: bholland@lathropgage.com

Attorneys for Larry E. Cook, Receiver//

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2015, I electronically filed the foregoing document, with the Clerk of the Court for the Western District of Missouri by using the CM/ECF system which will send a notice of electronic filing to all parties participating in the Court's CM/ECF system.

/s/ *Brian M. Holland*
An Attorney for Larry E. Cook, Receiver

13