UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>  Plaintiff,<br><br>v.<br><br>CWB SERVICES, LLC, et al.,<br><br>  Defendants. | CASE NO. 4:14-cv-000783-W-DW |

**PLAINTIFF'S SUGGESTIONS IN SUPPORT OF RECEIVER'S MOTION FOR TURNOVER OF PROPERTY OF THE RECEIVERSHIP ESTATE TRANSFERRED TO DNA INVESTMENTS, LLC, DAVID A. HARBOUR, AND ABBY HARBOUR**

# TABLE OF CONTENTS

I. THE COURT SHOULD VOID THE TRANSFERS BECAUSE
   THEY WERE FRAUDULENT ................................................................................... 1

   A. The Court Should Void the Transfers Because the DNA/Rowland Defendants
   Made them Intending to Hinder Creditors ................................................................... 2

      1. Direct Evidence Shows the Lenders' Intent to Hinder Creditors .......................... 3

      2. Indirect Evidence also Shows the Lenders' Intent to Hinder Creditors ................ 5

   B. The Court Should Void the Transfers Because the DNA/Rowland Defendants
   Received Nothing In Return and They Had Unreasonably Small Assets at the Time of
   the Transfers ................................................................................................................ 6

      1. Canyon Road, DNA, and the Harbours Provided Nothing in Exchange
         for the $6.6 Million ................................................................................................ 7

      2. The DNA/Rowland Defendants Transferred the Money Despite Having an
         Unreasonably Small Amount of Assets to Engage in Payday Lending ................ 9

II. THE COURT SHOULD IMPOSE A CONSTRUCTIVE TRUST ON THE
    TRANSFERRED MONEY AND PROPERTY PURCHASED WITH THAT MONEY
    BECAUSE DEFENDANTS OBTAINED IT UNLAWFULLY .................................10

   A. This Court Has Authority to Impose a Constructive Trust Where a Party Takes
   Property through Fraud or Unjust Enrichment............................................................10

   B. Courts Have Frequently Imposed Constructive Trusts in FTC Cases .......................12

   C. The DNA/Rowland Defendants Took Millions in Unlawful Payments From
   Consumers, Justifying Imposition of a Constructive Trust .........................................12

   D. The Receiver has Traced Consumer Payments to DNA and Harbour's Bank
   Accounts and Property ................................................................................................14

III. CONCLUSION ...............................................................................................................14

# TABLE OF AUTHORITIES

**Cases**
*Banner Constr. Corp. v. Arnold*, 128 So.2d 893 (Fla. Dist. App. 1961) ......................................... 5
*Brown v. Brown*, 152 S.W.3d 911 (Mo. Ct. App. 2005) ............................................................... 11
*Bueneman v. Zykan*, 52 S.W.3d 49 (Mo. Ct. App. 2001) ............................................................... 3
*Centerpoint Energy Svcs. v. Halim*, 743 F.3d 503 (7th Cir. 2014) ................................................ 4
*Checkett v. McGehee*, 342 B.R. 587 (Bankr. W.D. Mo. 2006) ..................................................... 10
*Favazza v. Path Media Holdings, LLC*, 4:12-cv-1561, 2014 WL 1846109 (E.D. Mo. May 8, 2014) ............................................................................................................................................ 4-5
*FTC v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16 (D.D.C. 2004) ................................... 12
*FTC v. Crittenden*, 823 F. Supp. 699 (C.D. Cal. 1993) ............................................................... 10
*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ............................................ 12
*FTC v. Real Wealth*, No. 10-cv-0060, 2011 WL 1930401 (W.D. Mo. May 17, 2011) ...... 10, 12
*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000). ............................... 12
*In re Moss*, 258 B.R. 405 (W.D. Mo. 2001) ................................................................................... 2
*In re: Broadview Lumber Co.*, 118 F.3d 1246 (8th Cir. 1997) .................................................... 10
*Kennedy v. Dixon*, 439 S.W.2d 173 (Mo. 1969) ............................................................................ 2
*McMerty v. Herzog*, 702 F.2d 127 (8th Cir. 1983) ...................................................................... 11
*Parke v. First Reliance*, 368 F.3d 999 (8th Cir. 2004) ................................................................ 10
*SEC v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512 (S.D.N.Y. 2001) .......................................... 11
*Taylor v. Clark*, 140 S.W.3d 242 (Mo. Ct. App. 2004) ......................................................... 2, 3, 6
*Taylor-McDonald v. Taylor*, 245 S.W.3d 867 (Mo. Ct. App. 2008) ........................................... 11

**Statutes**
Ariz. Rev. Stat. Ann. § 44-1004 ....................................................................................................... 2
Del. Code Ann. tit. 6, § 1304 ........................................................................................................... 2
Kan. Stat. Ann. § 33-204 .................................................................................................................. 5
Mo. Rev. Stat. § 428.005 .................................................................................................................. 2
Mo. Rev. Stat. § 428.009 .................................................................................................................. 5
Mo. Rev. Stat. § 428.024 ..................................................................................................... 2, 5, 6, 9

**Other Authorities**
Restatement (Second) of Conflict of Laws § 222 (1971) ................................................................ 2

The Commission supports the Receiver's motion to recoup the millions the DNA/Rowland Defendants[1] diverted to David and Abby Harbour and David Harbour's solely owned business, DNA Investments, LLC, because returning those ill-gotten gains will provide funds needed to compensate defrauded consumers. Although the FTC and the Receiver have conducted detailed financial analyses of Defendants' assets, any recovery will fall short of the tens of millions wrongfully taken from consumers by the DNA/Rowland Defendants. The difference between the potential recovery from Defendants and the harm is largely the result of transfers to third parties like DNA and the Harbours.[2] Requiring DNA and the Harbours to pay back the millions they took from the scheme will help ensure meaningful consumer redress.

The Court should grant the Receiver's motion for two reasons. First, the transfers to DNA are void under Missouri's Fraudulent Transfer Act. Second, even if the transfers were legitimate, the Harbours and DNA received the money subject to a constructive trust in favor of defrauded consumers.

**I.      THE COURT SHOULD VOID THE TRANSFERS BECAUSE THEY WERE FRAUDULENT.**

As the Receiver's motion explains, this Court can order DNA and the Harbours to return the $6.6 million DNA received from the DNA/Rowland Defendants because those transfers had no legitimate business purpose and therefore violated Missouri's Fraudulent

---

[1] As discussed in the FTC's Suggestions in Support of a Temporary Restraining Order (Doc. 9) and in the Receiver's motion, DNA Investments, LLC, and Rowland co-owned six of the named Defendants: Anasazi Group, Anasazi Services, Longboat Group, Oread Group, St. Armand's Group, and Vandelier Group. Consistent with the Receiver's motion, we refer to these collectively as the "DNA/Rowland Defendants."

[2] The Receiver continues to pursue claims against investors in the DNA/Rowland scheme and will likely recover additional money based on those claims.

1

Transfer Act. MO. REV. STAT. § 428.005 *et seq*. Missouri has adopted the Uniform Fraudulent Transfer Act ("UFTA"), which deems transfers fraudulent if a debtor: 1) makes them with "intent to hinder, delay, or defraud any creditor" or 2) does not receive "reasonably equivalent value in exchange for the transfer" while engaging in a business "for which [its] remaining assets . . . [are] unreasonably small . . . ." MO. REV. STAT. § 428.024.[3] The DNA transfers meet both criteria.

> ### A. The Court Should Void the Transfers Because the DNA/Rowland Defendants Made Them Intending to Hinder Creditors.

The UFTA provides that transfers made to hinder creditors are voidable. Therefore, where a party seeking to void a transfer shows intent by clear and convincing direct evidence, courts should undo the transfer. *Taylor v. Clark*, 140 S.W.3d 242, 251 (Mo. Ct. App. 2004). Because parties seeking to defeat creditors often hide the purposes of their transfers, courts do not require direct evidence showing intent. Instead, "it is acceptable in Missouri courts to determine the presence of fraud by considering particular badges of

---

[3] Missouri law should apply because Missouri has the "most significant relationship" with the funds at issue. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 222 (1971); *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. 1969) (adopting Second Restatement of Conflicts for choice-of-law questions). The DNA/Rowland Defendants used Defendant CWB Services to service their loans from its offices in Missouri. *See* Declaration of Michael Goldstein, Submitted in Support of Plaintiff's Motion for Temporary Restraining Order (Doc. 9) ¶¶ 20, 24-25. From that location, Defendants generated almost all of the funds in dispute by issuing loans with deceptive terms; directing unauthorized transactions in consumers' bank accounts; lying to consumers, banks, and debt purchasers about the loans' validity; and selling invalid debts. *See* Goldstein Decl. ¶¶ 54, 61-62. In any event, the other states whose laws could even conceivably apply, Delaware (DNA/Rowland Defendants' incorporation), Kansas (where Rowland lives and works), and Arizona (where Harbour lives and works), have also adopted the UFTA. *See* DEL. CODE ANN. tit. 6, § 1304; KAN. STAT. ANN. § 33-204; ARIZ. REV. STAT. ANN. § 44-1004. *See also In re Moss*, 258 B.R. 405, 425 (W.D. Mo. 2001) (recognizing that fraudulent-transfer analysis is identical under Arizona and Missouri law).

2

fraud." *Id*. Significantly, a party seeking to void the transfer does not need to establish all of the so-called badges of fraud listed in the UFTA. Rather, "a concurrence of several of them raises a presumption of fraud." *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo. Ct. App. 2001). Here, there is both direct and indirect evidence of fraudulent intent.

        **1.**    *Direct Evidence Shows the Lenders' Intent to Hinder Creditors.*

As shown in filings by both the Commission and the Receiver, the DNA/Rowland Defendants created a corporate structure to prevent consumers and regulators from collecting on claims against them. Specifically, they regularly transferred consumer payments away from the lenders, through shell corporations, and then on to DNA and investors. The five DNA/Rowland lenders received loan payments into their respective bank accounts. *See* Declaration of Michael Goldstein, Submitted in Support of Plaintiff's Motion for Temporary Restraining Order (Doc. 9) ("Goldstein Decl.") ¶¶ 109, 110. But the lenders did not keep the money in those accounts. Goldstein Decl. ¶ 118 ("[C]onsumer funds rarely remain[ed] in corporate accounts for long."). Instead, they sent it to shell corporations, including Canyon Road, of which DNA owned two-thirds and Rowland one-third. *See* Receiver's Motion for Turnover of Property of the Receivership Estate Transferred to DNA Investments, LLC, David A. Harbour and Abby Harbour (Doc. 150) ("Turnover Mot."), at p. 3-4 ("Canyon Road was a pass-through entity which received the cash generated from the corporate defendants' consumer lending scheme leaving the DNA/Rowland Lending Entities insolvent."); Goldstein Decl. ¶ 120 (noting transfers to Canyon Road and other entities controlled by Harbour and Rowland). Thus, despite

3

receiving almost $120 million in consumer payments,[4] the Defendant lenders never held sufficient assets to pay creditors.  Indeed, when this Court froze the DNA/Rowland lenders' bank accounts, they contained only $3,531.93.  *See* Receiver's Second Report (Doc. 56), p. 5.

The transfers to Canyon Road had no legitimate business purpose.  Canyon Road has no ownership interest in the lenders and provided no consideration for the transfers.  The DNA/Rowland Defendants could have paid any expenses directly, while retaining reasonable capital to operate as payday lenders.  Instead, they divested themselves of assets.

Moreover, the DNA/Rowland Defendants made these transfers on notice that actions by regulators and consumers were forthcoming.  Rowland and Harbour routinely received correspondence from state regulators forwarding consumer complaints about the lenders' deceptive and unauthorized loans.  *See, e.g.*, Ex. 1, Declaration of Daniel Temkin ("Temkin Decl.") ¶ 4, Attach. A (noting correspondence from state regulators forwarding hundreds of pages of complaints and threatening lawsuit, and attaching examples of complaints).  In addition, they received a copy of a class action lawsuit filed against Defendant Oread Group alleging that it routinely issued loans without authorization.  Temkin Decl., Attach. B.  Thus, the lenders' scheme to avoid paying potential claims from states and consumers by laundering money through Canyon Road shows an intent to hinder creditors.  *See, e.g.*, *Centerpoint Energy Svcs. v. Halim*, 743 F.3d 503, 506 (7th Cir. 2014) (transfers from business to individuals and to corporation with common ownership fraudulent under UFTA where transfers were designed to leave business' bank accounts

---

[4] The Receiver's motion includes a chart on page six with a column showing "Total Payments Received from Consumers."  The total of the amounts in the column is $118,916,799.

empty); *Favazza v. Path Media Holdings, LLC*, 4:12-cv-1561, 2014 WL 1846109, at *10 (E.D. Mo. May 8, 2014) (transfers from debtor corporations to corporations with common ownership violated Missouri's Fraudulent Transfer Act where transfers depleted debtors of assets to pay judgment creditors).

### 2. *Indirect Evidence also Shows the Lenders' Intent to Hinder Creditors.*

Not surprisingly, there is also ample indirect evidence of fraud. The transfers bear at least five of the badges of fraud listed in the UFTA. First, the lenders made them "to an insider." MO. REV. STAT. § 428.024(2)(1). The UFTA defines "insider" as including a "person in control" of the transferor. *Id.* § 428.009(7)(b)(c). DNA, as majority owner, had the power to control the lenders and Canyon Road through those LLCs' operating agreements, which required DNA and Rowland's unanimous consent for every action. Goldstein Decl. ¶¶ 37-40, 43, Attach. S, T, U, V, and X. In turn, Harbour, as DNA's sole owner and member, controlled DNA and, therefore, the lenders, making him an insider. *See Banner Constr. Corp. v. Arnold*, 128 So.2d 893, 896 (Fla. Dist. App. 1961) (assignment by one corporation to another having same control persons is badge of fraud). Second, the lenders concealed the transactions, MO. REV. STAT. § 428.024(2)(3), by transferring money to DNA through a superfluous shell corporation, Canyon Road. Third, the lenders knew that creditors had threatened suit while they transferred funds to DNA because Rowland and Harbour had received notice of potential lawsuits from states and consumers. *Id.* § 428.024(2)(4). Fourth, the transfers divested the lenders of substantially all of their assets. *Id.* § 428.024(2)(5). Fifth, the lenders did not receive reasonably equivalent consideration for the transfers. *Id.* § 428.024(2)(8). Indeed, they did not receive any consideration at all.

5

In addition to the badges of fraud listed in the UFTA,[5] three additional facts suggest intent. First, DNA did not negotiate the transfers in an arm's-length transaction. *See Taylor*, 140 S.W.3d at 251 (in determining fraudulent intent, Missouri courts consider whether transfers were "different from the usual method of transacting business"). Instead, Rowland simply told Harbour that he would give him two-thirds of the scheme's "profits." Temkin Decl., Attach. C, p. 58, ln 17-22. If Rowland and the lenders were engaging in legitimate business activity, they would have negotiated the payments to DNA/Harbour and demanded a commitment from Harbour to either provide capital or perform services. Second, Harbour and Rowland had a personal relationship. Harbour has been friends with Rowland's brother-in-law since childhood. Temkin Decl., Attach. C, p. 12, ln. 13-15. Finally, some of the transferred money recently funneled back to Rowland, suggesting that the DNA/Rowland Defendants transferred the money anticipating that they could still access some of it if they needed it. In October of last year, Harbour provided Rowland with $20,000 for legal fees to defend this action. Temkin Decl., Attach. D, p. 195, ln 11-14. If the DNA/Rowland Defendants had not transferred money to DNA in the first place, the Court's order would have likely frozen it for potential consumer redress.

> **B.   The Court Should Void the Transfers Because the DNA/Rowland Defendants Received Nothing In Return and They Had Unreasonably Small Assets at the Time of the Transfers.**

Even if the DNA/Rowland Defendants had not intended to hinder creditors, the transfers would still have been fraudulent under Section 428.024 because the lenders did not

---

[5] The UFTA's list of badges of fraud is non-exhaustive. *See* MO. REV. STAT. § 428.024(2) (providing that courts should consider the listed badges "among other factors").

Case 4:14-cv-00783-DW   Document 157   Filed 05/08/15   Page 9 of 18

receive anything in return, and they made the transfers while holding unreasonably small assets to issue payday loans.

### 1. *Canyon Road, DNA, and the Harbours Provided Nothing in Exchange for the $6.6 Million.*

The DNA/Rowland Defendants transferred consumer payments first to Canyon Road, a superfluous pass-through entity, and then to DNA's bank account, which the Harbours used for lavish personal expenses. Neither Canyon Road nor DNA, a one-man operation, provided value to the enterprise. Harbour, DNA's owner and sole member, admitted at a recent deposition that he did not provide any substantial value to the enterprise and was surprised to get as much money as he did. When Rowland set up the lenders, he made Harbour an owner through DNA only to ensure that someone could operate the companies "in case Ted [Rowland] got hit by a bus." Temkin Decl., Attach. C, p. 30, ln. 21-24. Harbour understood that he would get a "referral fee" for "introducing [Rowland] to people" who could fund his enterprise. Temkin Decl., Attach. C, p. 288, ln. 20-21. Consistent with that understanding, Harbour testified that he "never considered [himself] a majority owner of the companies . . . ." Temkin Decl., Attach. C, p. 192, ln. 14-15.

Nevertheless, the DNA/Rowland Defendants gave him, through DNA, the right to two-thirds of the scheme's "profits" for eternity. And Harbour did not even negotiate for the payments. Instead, he described it this way: "It was never like, Okay, you own 67 and I own 33, it was never that way, it was just[, ']I'm giving you this money.[']" Temkin Decl., Attach. C, p. 58, ln 17-22. Harbour expected a much lower amount of money considering

7

his lack of involvement, stating that he anticipated receiving 20 percent of the profits,[6] but "I'm not going to say no" to receiving two-thirds. Temkin Decl., Attach. C, p. 31, 19-25.

The lenders and Rowland placed no conditions on Harbour's receipt of money from the scheme. Harbour provided no capital to the enterprise, nor did he pay anything for his majority ownership interest or assist in starting operations. Rather, his involvement was limited to introducing Rowland to potential investors. Harbour described these introductions as simply calling people and saying: "There is an opportunity for you to be a lender to a guy named Ted Rowland. It's in the payday lending space and it pays anywhere from, you know, 18 to 25 plus percent and here's Ted's telephone number. Here's how I know Ted. It's my best pal's brother-in-law, and are you interested?" Temkin Decl., Attach. C, p. 159, ln. 19-25.

After lending began, Harbour ignored the operation and let the money roll in. He did not monitor day-to-day operations. Temkin Decl., Attach. C, p. 133, ln. 8-9. He did not review loan documents. Temkin Decl., Attach. C, p. 64, ln. 2-5. He did not review complaints, even though he routinely received them. Temkin Decl., Attach. C, p. 81, ln. 12-14; and Attach. A. By his own admission, he "pretty much mentally checked out." Temkin Decl., Attach. C, p. 133, ln. 13.

Finally, Abby Harbour routinely took funds from DNA's account and never assisted the lenders in any way. Harbour's deposition testimony shows that he considered DNA's assets as his and his wife's assets. Specifically, when asked why his wife was able to write checks on DNA's account even though she was not a member, owner, or employee, he

---

[6] Considering that Harbour did not provide capital or do any substantial work for the enterprise, even 20 percent would have been an outrageous overpay.

responded, "it's not as if I needed to question my wife on what she was doing with **our money**." Temkin Decl., Attach. C, p. 302, ln. 23-24 (emphasis added).

### 2. *The DNA/Rowland Defendants Transferred the Money Despite Having an Unreasonably Small Amount of Assets to Engage in Payday Lending.*

The Harbours received millions from the lenders without risking any capital and without doing any work. They cannot keep those payments because the lenders made them while holding "unreasonably small [assets] in relation to" their payday lending business. MO. REV. STAT. § 428.024(1)(2)(a).

Payday lending operations are high-risk ventures that require capital to cover potential legal liabilities. Furthermore, they must comply with state and federal regulations. Finally, because these loans have high default rates, payday lenders must address debt collection issues and problems arising from electronic bank debit transactions.

Even a conscientious, diligent online payday lending operation – which this was not – will incur legal liabilities. But the DNA/Rowland Defendants ignored state regulator complaints about their deceptive lending operations. And they divested themselves of any funds that they could use to correct the problems or pay claims based on the complained-of activity. So far, their scheme to divest the lenders has succeeded, leaving a paltry $3,500 in the lenders' accounts at the time of the asset freeze. Meanwhile, the Harbours used the $6.6 million transferred to DNA to buy luxury goods, including private chartered jets, extravagant birthday celebrations, golf club memberships, and vacation homes in Mexico and Idaho. Turnover Mot., p. 7-8.

**II.     THE COURT SHOULD IMPOSE A CONSTRUCTIVE TRUST ON THE TRANSFERRED MONEY AND PROPERTY PURCHASED WITH THAT MONEY BECAUSE DEFENDANTS OBTAINED IT UNLAWFULLY.**

Even if the transfers to DNA had not violated the UFTA, DNA and the Harbours must return the transferred funds, and the property purchased with those funds, because they hold those funds in constructive trust for defrauded consumers. This Court has the power to impose a constructive trust to restore property taken through fraud or unjust enrichment, and courts frequently impose those trusts in FTC cases. The Court should impose a trust here because the Receiver has traced the fruits of Defendants' unlawful practices to the Harbours' bank accounts, real property, and other assets.

**A.     The Court Has Authority to Impose a Constructive Trust Where a Party Takes Property through Fraud or Unjust Enrichment.**

This Court has imposed constructive trusts where a defendant has taken property through fraud. *See FTC v. Real Wealth*, No. 10-cv-0060, 2011 WL 1930401, at *7 (W.D. Mo. May 17, 2011) (finding that frozen assets were held in constructive trust for consumers injured by defendants' fraudulent actions); *see also Checkett v. McGehee*, 342 B.R. 587, 591 (Bankr. W.D. Mo. 2006). In addition, the Eighth Circuit has held that a "constructive trust is imposed when a defendant has possession of particular funds or property that in good conscience belong to the plaintiff." *Parke v. First Reliance*, 368 F.3d 999, 1008 (8th Cir. 2004) (internal citations omitted); *see also In re: Broadview Lumber Co.*, 118 F.3d 1246, 1253 (8th Cir. 1997) ("the purpose of a constructive trust is to restore to the rightful owner the property wrongfully withheld by the defendant") (internal citations omitted).

Courts look to state law when analyzing constructive trust. *See, e.g., FTC v. Crittenden*, 823 F. Supp. 699, 703 (C.D. Cal. 1993) (constructive trust is a "creature of state

10

law"). Here, the Court should apply Missouri law because, as noted above, it has the most significant contacts with the funds in dispute. *See also SEC v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512, 531 (S.D.N.Y. 2001) ("the general rule under both state and federal choice of law rules is that the law of the situs of the property, and therefore the trust, governs the determination" of whether property is held in constructive trust) (internal citations omitted) *rev'd in part on other grounds by* 297 F.3d 127 (2d Cir. 2002).

Missouri law considers constructive trusts a "fluid, flexible device, which may be employed to remedy many different types of injustice." *Brown v. Brown*, 152 S.W.3d 911, 918 (Mo. Ct. App. 2005). The "touchstone for imposition of a constructive trust is injustice or unfairness, which may take the form or be the product of fraud (actual or constructive), abuse of a fiduciary or confidential relationship, undue influence, or unjust enrichment." *Id.*

As an equitable remedy, a party asserting a constructive trust must identify the property that the defendant took wrongfully. *Taylor-McDonald v. Taylor*, 245 S.W.3d 867, 875 (Mo. Ct. App. 2008). Significantly, courts can impose trusts both on property that has left the wrongdoer's hands and on the proceeds from sale or conversion of that property. *Id.* (affirming trial court's decision to impose trust on herd of cattle purchased with wrongfully taken money); *McMerty v. Herzog*, 702 F.2d 127, 130 (8th Cir. 1983) (affirming district court decision imposing trust on property purchased with wrongfully acquired funds). Moreover, the trust beneficiary is entitled to any increase in value that accrues after the wrongdoer takes the property. *See Taylor,* 245 S.W.3d at 875*.*

11

### B. Courts Have Frequently Imposed Constructive Trusts in FTC Cases.

Courts in this circuit and others have imposed constructive trusts in FTC cases. This Court imposed a constructive trust in *FTC v. Real Wealth*, where the defendants used deceptive solicitations to market work-at-home opportunities and grant-application products. 2001 WL 1930401, at *7. Courts have similarly imposed constructive trusts on consumer funds, including funds held by third parties, in many other FTC cases. *See, e.g.*, *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141-45 (9th Cir. 2010); *FTC v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16, 19-20 (D.D.C. 2004); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000). Furthermore, after imposing those trusts, courts have ordered third parties to turn over the trust property to the FTC. *See, e.g.*, *Network Servs.*, 617 F.3d at 1138.

### C. The DNA/Rowland Defendants Took Millions in Unlawful Payments From Consumers, Justifying Imposition of a Constructive Trust.

Because the DNA/Rowland Defendants took money from consumers through their fraudulent payday lending scheme, the Court can impose a constructive trust on that money, or any property DNA or the Harbours purchased with that money. As described in the FTC's Suggestions in Support of its Motion for Temporary Restraining Order (Doc. 9), the DNA/Rowland Defendants' loans violated the FTC Act, the Truth in Lending Act ("TILA"), and the Electronic Fund Transfer Act in at least two ways.

First, Defendants engaged in "autofunding," in which Defendants issued so-called loans to consumers without obtaining their consent, and used those "loans" as a basis for subsequently debiting consumers' bank accounts. Defendants buttressed their autofunding by lying to consumers, banks, and debt purchasers about the legitimacy of the loans.

12

Second, Defendants deceived consumers who wanted loans about the amount they would have to pay. Specifically, their TILA disclosures falsely advised that borrowers would owe a single payment of the principal plus thirty percent of the balance. But buried in fine print, the loan documents provided that, unless borrowers took certain affirmative steps, they would make interest-only payments indefinitely. Therefore, even consumers who consented to Defendants' payday loans did not consent to their exorbitant terms.

In addition to the overwhelming evidence detailed in the FTC's TRO Brief and supporting declarations, the Receiver confirmed the FTC's allegations through his independent review of emails, voicemails, loan documents, loan management software used by the Defendants, and other materials. *See* Turnover Mot., p. 5-6. The Receiver further reported that the DNA/Rowland lending entities took over $16 million from consumers in unauthorized "loan payments" on autofunded loans and almost $40 million in net payments on their loans with deceptive disclosures. Turnover Mot., p. 6-7. And the Receiver identified that $6.6 million of that money was transferred to DNA's bank account, which was controlled by David and Abby Harbour. Turnover Mot., p. 7. Those funds, therefore, are the product of Defendants' fraud and should be subject to a constructive trust.

The Court can also impose a constructive trust based on unjust enrichment. As described above, David Harbour described his role as limited to introducing Rowland to potential investors. He stated that he did not know why he received two-thirds of the profits, and expected to receive far less, such as twenty percent of the profits, in a "typical 80/20 deal." Temkin Decl., Attach. C, p. 31, ln. 20-21. Harbour was thus unjustly enriched by the funds he received from the lending scheme. And Abby Harbour was

13

unjustly enriched because, as her husband testified, she provided no services whatsoever to DNA, yet was a signatory on its bank account and used DNA funds for personal expenses on a regular basis. Turnover Mot., p. 7; Temkin Decl., Attach. C, p. 303, ln. 7-10.

### D. The Receiver has Traced Consumer Payments to DNA and Harbour's Bank Accounts and Property.

The Receiver has traced $6.6 million in consumer funds to Harbour's bank accounts, real property, and miscellaneous other property. As described in the Receiver's motion, consumer funds went into the lenders' bank accounts, then to Canyon Road, and finally to DNA. And the Harbours used consumer funds in DNA's account for personal expenses, including to purchase interests in luxury vacation condominiums, sailboats, and golf club memberships. In addition, the Harbours have transferred nearly $3 million to their personal accounts. The Court should, therefore, impose a constructive trust on the funds and property purchased with those funds and order DNA and the Harbours to return those assets to the Receivership estate.

### III. CONCLUSION

DNA and the Harbours received over $6.6 million that the DNA/Rowland Defendants took from consumers through fraud. While consumers suffered from Defendants' unauthorized bank debits and from harassment by debt collectors on invalid loans, the Harbours used the fraud proceeds to fund an extravagant lifestyle and purchase

luxury goods. To correct that injustice, the Court should order the Harbours to give the money back by voiding the transfers as fraudulent under the UFTA and imposing a constructive trust.

                                      Respectfully submitted,

                                      JONATHAN E. NUECHTERLEIN
                                      General Counsel

Dated: May 8, 2015          /s/ Matthew J. Wilshire
                                      Matthew J. Wilshire, DC Bar #483702
                                      Rebecca M. Unruh, DC Bar #488731
                                      Lisa A. Rothfarb, MD Bar
                                      Federal Trade Commission
                                      600 Pennsylvania Ave., N.W., CC-10232
                                      Washington, D.C. 20580
                                      202-326-3565 (Unruh)
                                      202-326-2976 (Wilshire)
                                      202-326-2602 (Rothfarb)
                                      E-mail: runruh@ftc.gov

                                      TAMMY DICKINSON
                                      United States Attorney

Dated: May 8, 2015          /s/ Charles M. Thomas
                                        Charles M. Thomas, MO Bar #28522
                                      Assistant United States Attorney
                                      Charles Evans Whittaker Courthouse
                                      400 East Ninth Street, Room 5510
                                      Kansas City, MO 64106
                                      Telephone: (816) 426-3130
                                      Facsimile: (816) 426-3165
                                      E-mail: charles.thomas@usdoj.gov

                                      Attorneys for Plaintiff
                                      FEDERAL TRADE COMMISSION