# DECLARATION OF DANIEL TEMKIN
## PURSUANT TO 28 U.S.C. § 1746

I, Daniel Temkin, hereby state that I have personal knowledge of the facts as set forth below. If called as a witness, I could and would testify as follows:

1. I am a citizen of the United States and am over 18 years old. I am employed as a paralegal specialist with the Federal Trade Commission ("FTC") in the Division of Financial Practices ("DFP"). My office address is 600 Pennsylvania Avenue, N.W., Mail Stop CC 10232, Washington, D.C. 20580.

2. I began working at the FTC in August 2013. My responsibilities include investigating suspected violations of consumer protection laws, including the Federal Trade Commission Act, the Truth in Lending Act, and the Electronic Fund Transfer Act. In the normal course of carrying out my responsibilities, I regularly use Internet search engines, electronic databases, spreadsheet software, and a variety of other software-based investigative and organizational tools. I also oversee implementation of asset freezes pursuant to court orders.

3. In or around January 2014, I was assigned to an FTC investigation of certain online payday lenders. These lenders include: CWB Services, LLC (CWB); Orion Services, LLC; Sandpoint Capital, LLC; Sandpoint, LLC; Basseterre Capital, LLC; Namakan Capital, LLC; Vandelier Group LLC; St. Armands Group LLC; Anasazi Group LLC; Anasazi Services LLC; Longboat Group LLC (d/b/a Cutter Group); Oread Group LLC (d/b/a Mass Street Group); Timothy A. Coppinger; and Frampton T. Rowland, III (collectively "Defendants").

4. In or around March and April 2015, FTC staff obtained documents from David Harbour and DNA Investments, LLC, pursuant to two subpoenas issued in FTC v. CWB Services, et al. These documents include hundreds of pages of complaints from state regulatory agencies. Many of these complaints include allegations that corporate Defendants funded loans without

consumer authorization. True and correct copies of some of these complaints are appended hereto as **Attachment A**.

5.  The documents produced by David Harbour and DNA Investments also included a class-action lawsuit complaint. A true and correct copy of this complaint, without exhibits, is appended hereto as **Attachment B**.

6.  On April 7, 2015, FTC staff deposed DNA Investments, LLC and David Harbour. True and correct copies of pages from the transcript from this deposition are appended hereto as **Attachment C**.

7.  On October 16, 2014, FTC staff deposed Defendant Frampton T. Rowland, III and certain corporate Defendants under his control. True and correct copies of pages from the transcript from this deposition are appended hereto as **Attachment D**.

8.  Certain confidential information has been redacted from the attachments to this declaration.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the statements made in this declaration are true and correct.

Executed in Washington, D.C., on the 8 day of May, 2015

_____
Daniel Temkin

# ATTACHMENT A

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**DIVISION OF CONSUMER SERVICES**

| | |
|---|---|
| IN THE MATTER OF DETERMINING<br>Whether there has been a violation of the<br>Check Cashers and Sellers Act of Washington by:<br><br>LONGBOAT GROUP, LLC d/b/a CUTTER<br>GROUP;<br>ST. ARMANDS GROUP, LLC;<br>VANDELIER GROUP, LLC;<br>ANASAZI GROUP, LLC;<br>FRAMPTON T. ROWLAND, III a/k/a TED<br>ROWLAND, Managing Member and Co-<br>Owner;<br>DNA INVESTMENTS, LLC, Majority Owner;<br>and<br>DAVID HARBOUR, Managing Member and<br>Owner (of DNA INVESTMENTS, LLC),<br><br>Respondents. | No.: C-13-1319-14-SC01<br><br>STATEMENT OF CHARGES and<br>NOTICE OF INTENTION TO ENTER AN<br>ORDER TO CEASE AND DESIST, BAN<br>FROM INDUSTRY, IMPOSE FINE,<br>ORDER RESTITUTION, AND COLLECT<br>INVESTIGATION FEE |

**INTRODUCTION**

Pursuant to RCW 31.45.110 and RCW 31.45.200, the Director of the Department of Financial Institutions of the State of Washington (Director) is responsible for the administration of chapter 31.45 RCW, the Check Cashers and Sellers Act (Act). After having conducted an investigation pursuant to RCW 31.45.100, and based upon the facts available as of February 11, 2014, the Director, through his designee, Division of Consumer Services Director Deborah Bortner, institutes this proceeding and finds as follows:

**I. FACTUAL ALLEGATIONS**

**1.1    Respondents.**

**A.    Longboat Group, LLC d/b/a Cutter Group (Cutter)** is a Delaware Limited Liability Company with its principal place of business believed to be located at 7301 Mission Road,

STATEMENT OF CHARGES                                           1
C-13-1319-14-SC01
LONGBOAT GROUP, LLC d/b/a CUTTER GROUP, et. al.

DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Consumer Services
PO Box 41200
Olympia, WA 98504-1200
(360) 902-8703

CONFIDENTIAL                                                                                                    DNA_0000241

1  Suite 318, Prairie Village, Kansas 66208. Respondent Cutter has never obtained a license in

2  accordance with the Act to make loans.

3        **B.**     **St. Armands Group, LLC (St. Armands)** is a Delaware Limited Liability Company

4  with its principal place of business believed to be located at 7301 Mission Road, Suite 318, Prairie

5  Village, Kansas 66208. Respondent St. Armands has never obtained a license in accordance with the

6  Act to make loans.

7        **C.**     **Vandelier Group, LLC (Vandelier)** is a Delaware Limited Liability Company with

8  its principal place of business believed to be located at 7301 Mission Road, Suite 318, Prairie Village,

9  Kansas 66208. Respondent Vandelier has never obtained a license in accordance with the Act to

10  make loans.

11        **D.**     **Anasazi Group, LLC (Anasazi)** is a Delaware Limited Liability Company with its

12  principal place of business believed to be located at 7301 Mission Road, Suite 318, Prairie Village,

13  Kansas 66208. Respondent Anasazi has never obtained a license in accordance with the Act to make

14  loans.

15        **E.**     **Frampton T. Rowland, III a/k/a Ted Rowland (Rowland)** is Managing Member

16  and 33.3% Owner of Respondents Cutter, St. Armands, Vandelier, and Anasazi.

17        **F.**     **DNA Investments, LLC (DNA)** is a Delaware Limited Liability Company which is

18  66.7% Owner of Respondents Cutter, St. Armands, Vandelier, and Anasazi.

19        **G.**     **David Harbour (Harbour)** is the Sole Managing Member and 100% Owner of

20  Respondent DNA.

21  **1.2**     **Unlicensed Activity.** For at least the period from August 2011 through November 2012,

22  Respondents have conducted business by providing loans to at least six consumers physically located

23  in Washington State without being licensed by the Department as a check casher and seller with a

24  small loan endorsement. The Department received from Washington consumers at least two

STATEMENT OF CHARGES                 2                DEPARTMENT OF FINANCIAL INSTITUTIONS
C-13-1319-14-SC01                                       Division of Consumer Services
LONGBOAT GROUP, LLC d/b/a CUTTER GROUP, *et al.*                     PO Box 41200
                                              Olympia, WA 98504-1200
                                              (360) 902-8703

CONFIDENTIAL

1 complaints about Respondent Cutter, at least two complaints about Respondent St. Armands, at least
2 four complaints about Respondent Vandelier, and at least two complaints about Respondent Anasazi.

3 **1.3     Failure to Disclose Terms of Small Loans to Borrowers.** Respondents have failed to
4 provide borrowers with statutorily required written agreements or written disclosures during the
5 course of making small loans. At least six Washington consumers stated they never received any
6 documents disclosing the terms of the loan from Respondents before money was deposited into their
7 bank account.

8 **1.4     Charging Interest on Small Loans in Excess of Statutory Maximum.** Respondents have
9 charged interest or fees in the aggregate exceeding 15% of the first $500 of aggregated principal of
10 small loans outstanding at any one time. Respondents Cutter and Vandelier both charged at least one
11 Washington consumer 782.14% on a $250 loan.

12 **1.5     Charging Fees on Delinquent Small Loans in Excess of Statutory Maximum.**
13 Respondents Cutter's and Vandelier's contracts state that the fee for a return by the consumer's
14 financial institution is $30, plus all finance charges. This amount is in excess of a one-time fee of up
15 to $25 as allowed by the Act.

16 **1.6     On-going Investigation.** The Department's investigation into the alleged violations of the
17 Act by Respondents continues to date.

18                                    **II. GROUNDS FOR ENTRY OF ORDER**

19 **2.1     Definition of Check Casher.** Pursuant to RCW 31.45.010(5), a "Check Casher" is defined as
20 an individual, partnership, unincorporated association, or corporation that, for compensation,
21 engages, in whole or in part, in the business of cashing checks, drafts, money orders, or other
22 commercial paper serving the same purpose.

23

24

STATEMENT OF CHARGES                                   3
C-13-1319-14-SC01
LONGBOAT GROUP, LLC d/b/a CUTTER GROUP, et. al.

DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Consumer Services
PO Box 41200
Olympia, WA 98504-1200
(360) 902-8703

CONFIDENTIAL

1    **2.2**    **Definition of Small Loan**. Pursuant to RCW 31.45.010(21), a "Small Loan" is defined as a

2    loan of up to the maximum amount and for a period of time up to the maximum term specified in

3    RCW 31.45.073.

4    **2.3**    **Definition of Licensee.** Pursuant to RCW 31.45.010(13), a "Licensee" means a check casher

5    or seller licensed by the director to engage in business in accordance with this chapter. "Licensee"

6    also means a check casher or seller, whether located within or outside of this state, who fails to obtain

7    the license or small loan endorsement required by this chapter.

8    **2.4**    **Requirement to Obtain a Check Casher and Seller License**. Based on the Factual

9    Allegations set forth in Section I above, Respondents are in apparent violation of RCW 31.45.030(1)

10    for engaging in the business of a check casher and seller without first obtaining a license from the

11    Director.

12    **2.5**    **Requirement to Obtain a Small Loan Endorsement**. Based on the Factual Allegations set

13    forth in Section I above, Respondents are in apparent violation of RCW 31.45.070(1), RCW

14    31.45.073(1), and RCW 31.45.105(1)(a)-(d) for engaging in the business of making small loans

15    without first obtaining a small loan endorsement from the Director.

16    **2.6**    **Requirement to Provide Small Loan Disclosures**. Based on the Factual Allegations set

17    forth in Section I above, Respondents are in apparent violation of RCW 31.45.088(3), WAC 208-

18    630-490, and WAC 208-630-500 for failing to provide disclosures to small loan borrowers including

19    the terms of the small loan, the principal amount of the small loan, and the annual percentage rate

20    resulting from the fee or interest rate.

21    **2.7**    **Statutory Maximum Interest for Small Loans**. Based on the Factual Allegations set forth

22    in Section I above, Respondents are in apparent violation of RCW 31.45.073(5) and WAC 208-630-

23    466(1) for charging interest for small loans that exceeds in the aggregate 15% of the first $500 of

24    principal.

STATEMENT OF CHARGES        4        DEPARTMENT OF FINANCIAL INSTITUTIONS
C-13-1319-14-SC01        Division of Consumer Services
LONGBOAT GROUP, LLC d/b/a CUTTER GROUP, *et. al.*        PO Box 41200
       Olympia, WA 98504-1200
       (360) 902-8703

CONFIDENTIAL

1  **2.8  Statutory Maximum Fees on Delinquent Small Loans.**  Based on the Factual Allegations

2  set forth in Section I above, Respondents are in apparent violation of RCW 31.45.082(1) for charging

3  fees on delinquent small loans in excess of a one-time fee as determined in rule by the director where

4  a borrower's check has been returned unpaid by the financial institution upon which it is drawn.

5  Pursuant to WAC 208-630-542, the allowable one-time fee where a borrower's check has been

6  returned unpaid by the financial institution upon which it is drawn is currently up to $25.

7  <center>**III. AUTHORITY TO IMPOSE SANCTIONS**</center>

8  **3.1  Authority to Issue Cease and Desist Order.**  Pursuant to RCW 31.45.110(2)(b), the Director

9  may order a licensee to cease and desist from practices in violation of the Act or practices that

10  constitute unsafe and unsound financial practices.

11  **3.2  Authority to Ban from the Industry.**  Pursuant to RCW 31.45.110(2)(e), the Director may

12  ban from participation in the conduct of the affairs of any licensee any director, officer, sole

13  proprietor, partner, controlling person, or employee of a licensee that is violating or has violated the

14  Act including rules.

15  **3.3  Authority to Impose Fine.**  Pursuant to RCW 31.45.110(2)(c), the Director may impose a

16  fine, not to exceed one hundred dollars per day for each day's violation of the Act, on any licensee or

17  applicant, or any director, officer, sole proprietor, partner, controlling person, or employee of a

18  licensee or applicant, that is violating or has violated the Act including rules.

19  **3.4  Authority to Order Restitution.**  Pursuant to RCW 31.45.110(2)(d), the Director may order

20  restitution to borrowers damaged by the licensee's violation of this chapter.

21  **3.5  Authority to Collect Investigation Fee.**  Pursuant to RCW 31.45.050(1), RCW 31.45.100,

22  WAC 208-630-360, WAC 208-630-370, and WAC 208-630-380, the Director shall collect from the

23  licensee the actual cost of an investigation of the business, books, accounts, records, files, or other

24  information of a licensee or person who the Director has reason to believe is engaging in the business

STATEMENT OF CHARGES                                    5
C-13-1319-14-SC01
LONGBOAT GROUP, LLC d/b/a CUTTER GROUP, *et. al.*

DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Consumer Services
PO Box 41200
Olympia, WA  98504-1200
(360) 902-8703

CONFIDENTIAL
DNA_0000245

1   governed by the Act. The investigation charge will be calculated at the rate of $69 per hour that each

2   staff person devoted to the investigation, plus actual expenses.

3 **IV. NOTICE OF INTENTION TO ENTER ORDER**

4     Respondent's violations of the provisions of chapter 31.45 RCW and chapter 208-630 WAC,

5   as set forth in the above Factual Allegations and Grounds for Entry of Order, constitute a basis for the

6   entry of an Order under RCW 31.45.110 and RCW 31.45.200. Therefore, it is the Director's

7   intention to ORDER that:

8   **4.1**   Respondents Longboat Group, LLC d/b/a Cutter Group, St. Armands Group, LLC, Vandelier Group, LLC, Anasazi Group, LLC, Frampton T. Rowland, III a/k/a Ted

9       Rowland, DNA Investments, LLC, and David Harbour cease and desist from offering or making small loans to Washington State residents;

10

11   **4.2**   Respondents Longboat Group, LLC d/b/a Cutter Group, St. Armands Group, LLC, Vandelier Group, LLC, Anasazi Group, LLC, Frampton T. Rowland, III a/k/a Ted

12       Rowland, DNA Investments, LLC, and David Harbour be banned from participation in the conduct of the affairs of any check casher or check casher with a small loan

13       endorsement or check seller subject to licensure by the Director, in any manner, for a period of five (5) years;

14   **4.3**   Respondents Longboat Group, LLC d/b/a Cutter Group, St. Armands Group, LLC, Vandelier Group, LLC, Anasazi Group, LLC, Frampton T. Rowland, III a/k/a Ted

15       Rowland, DNA Investments, LLC, and David Harbour jointly and severally pay a fine, which as of the date of this Statement of Charges is $50,000;

16

17   **4.4**   Respondents Longboat Group, LLC d/b/a Cutter Group, St. Armands Group, LLC, Vandelier Group, LLC, Anasazi Group, LLC, Frampton T. Rowland, III a/k/a Ted

18       Rowland, DNA Investments, LLC, and David Harbour jointly and severally pay restitution to all affected Washington State borrowers for any interest or fees collected on small loans originated without a license; and

19

20   **4.5**   Respondents Longboat Group, LLC d/b/a Cutter Group, St. Armands Group, LLC, Vandelier Group, LLC, Anasazi Group, LLC, Frampton T. Rowland, III a/k/a Ted

21       Rowland, DNA Investments, LLC, and David Harbour jointly and severally pay an investigation fee of $4,623.

22 \\

23 \\

24 \\

STATEMENT OF CHARGES      6
C-13-1319-14-SC01
LONGBOAT GROUP, LLC d/b/a CUTTER GROUP, *et. al.*

DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Consumer Services
PO Box 41200
Olympia, WA 98504-1200
(360) 902-8703

CONFIDENTIAL

DNA_0000246

# V. AUTHORITY AND PROCEDURE

This Statement of Charges and Notice of Intention to Enter an Order to Cease and Desist, Ban from Industry, Impose Fine, Order Restitution, and Collect Investigation Fee (Statement of Charges) is entered pursuant to the provisions of RCW 31.45.110 and RCW 31.45.200, and is subject to the provisions of chapter 34.05 RCW (The Administrative Procedure Act). Respondents may make a written request for a hearing as set forth in the NOTICE OF OPPORTUNITY TO DEFEND AND OPPORTUNITY FOR HEARING accompanying this Statement of Charges.

Dated this ___4th___ day of ___March___, 2014.

_____
DEBORAH BORTNER
Director, Division of Consumer Services
Department of Financial Institutions

Presented by:

_____
DEVON P. PHELPS
Financial Legal Examiner

Approved by:

_____
CHARLES E. CLARK
Enforcement Chief

CONFIDENTIAL                                                                                              DNA_0000247



## State of North Carolina

ROY COOPER
ATTORNEY GENERAL

Department of Justice
9001 Mail Service Center
Raleigh, NC 27699-9001

CONSUMER PROTECTION
Toll Free In NC
(877) 566-7226
Outside of NC
(919) 716-6000
Fax: (919) 716-6050

January 23, 2013

Mass Street Group
c/o CWB Services, LLC
P. O. Box 411056
Kansas City, MO 64141

    Re:    File No.⬛⬛⬛
           John A Finnell


Dear Sir:

   This office has received a consumer complaint regarding your company from the above referenced individual. A copy of the complaint is enclosed for your review.

   It appears that your company is offering payday loans to North Carolina consumers. You should be aware that payday loans are not authorized in North Carolina. North Carolina's Consumer Finance Act, N. C. Gen. Stat. § 53-164 et seq., regulates small consumer loans and allows a maximum interest rate of up to 36% for licensed lenders. Further, N. C. Gen. Stat. § 53-166(d) provides that consumer loans under $10,000 made in violation of the Consumer Finance Act are void. Loans made by out-of-state lenders to North Carolina residents can be subject to our usury laws. N. C. Gen. Stat. § 24-2.1 states that any solicitation to lend originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State shall be deemed to be an offer or agreement to lend in this State. Further, under that statute any communication to borrow from a North Carolina consumer to an out-of-state lender shall be deemed to be an acceptance to borrow in this State.

   We request that you respond within fifteen (15) business days to the enclosed consumer complaint and that you state your intentions to comply with North Carolina law. Because of the serious legal issues raised by the enclosed complaint, we request that you cease and desist from further collection activity on this account. When responding, please refer to File No. 1218677.

CONFIDENTIAL     Case 4:14-cv-00783-DW   Document 157-1   Filed 05/08/15   Page 11 of 65   DNA_0004652

Sincerely,

Jennifer S. Day
Consumer Protection Specialist
CONSUMER PROTECTION DIVISION

Enclosure

cc:     John A Finnell



**NORTH CAROLINA**
**DEPARTMENT OF JUSTICE**
ATTORNEY GENERAL **ROY COOPER**

Consumer › File a Complaint › Complaint Form

# FILE A COMPLAINT

\* indicates a mandatory field

## Your Information

| | | | |
|---|---|---|---|
| Prefix: | Mr. ▾ | \* First Name: | John |
| Middle Initial: | A | \* Last Name: | Finnell |
| \* Mailing Address: | ▓▓▓▓▓ | | |
| \* City: | Micro | | |
| \* State: | NC | \* Zip Code: | ▓▓▓ |
| Country, if not US: | | | |
| Day Phone Number (including area code): | ▓▓▓▓ | | |
| Evening Phone Number (including area code): | ▓▓▓▓ | | |
| Cell Phone Number (including area code): | ▓▓▓▓ | | |
| Fax Number (including area code): | | | |
| County of Residence: | Johnston | Email Address: | ▓▓▓▓ |

## Information About Company Against Which You Are Complaining

| | |
|---|---|
| \* Full name of company: | Mass Street Group |
| Address: | unknown |
| City: | unknown |
| State: | Zip Code: unknown |
| Country, if not US: | |

CONFIDENTIAL    Case 4:14-cv-00783-DW    Document 157-1    Filed 05/08/15    Page 13 of 65    DNA_0004654

Company's internet address (URL):                    massinfo@cwbservices.r

\* Telephone number, including area code:            877-781-4330

Fax number, including area code:                     888-519-2058

# Complaint Information (complete any blocks which apply to your complaint)

Product, item, or service involved:     consumer loan

Date of purchase, service, contract:              10-12-12              Now

Manufacturer
or brand:

Model:

Account          75448
number:

Serial
number:

**Do not submit credit card
or bank account numbers
through this form. If you
need to provide that
information as part of
your complaint, please
mail it to us instead.**

Did you sign    ○Yes
a contract or   ◉No
a lease?:

Start Date:     10-12-12        Now        End Date:     12/6/2012
                                                         Now

Total amount  0                            Amount in    $300 +int. & refinance fe
paid:                                      dispute:

How was       [Cash          ▼]
payment
made::

Did you buy
an extended   [No ▼]
service
contract?:

CONFIDENTIAL   Case 4:14-cv-00783-DW   Document 157-1   Filed 05/08/15   Page 14 of 65   DNA_0004655

If yes, name of company responsible for extended service
contract or warranty:

## Information About the Transaction

How was initial contact made between you | I responded to a Website or e-mail solicitation ▼ |
and the:

Where did the transaction take place?:    | Via computer (website or e-mail) ▼ |

## Details of Complaint

See attached

* Details:

Limit of 2500
characters

## Resolution Attempts You Have Made

Have you contacted the company with          | Yes ▼ |
your complaint?:

If yes, name of person most recently          no name given
contacted:

His/her phone number, incl. area code:       replied to email

CONFIDENTIAL   Case 4:14-cv-00783-DW   Document 157-1   Filed 05/08/15   Page 15 of 65   DNA_0004656

Results:

They say my account has been
turned over to collections

* What resolution would you consider
fair?:

I will gladly return the $300
that they placed in my
checking account if they will
state in writing that I do not
owe any interest or refinance

Do you have an attorney in this case?:    No

If yes, name of your attorney:

Attorney's number, incl. area code:

Has your complaint been heard or is it
scheduled to be heard in court?:    No

If yes, where and when?:

If already heard, what was the result?:

Will you be submitting documentation
by mail or fax?:    Yes

Please attach up to four supporting documents in pdf, doc, docx or txt format. You may
also mail supporting documents to us.

Attachment 1:

Upload:
[ Browse... ]

Attachment 2:

Upload:
[ Browse... ]

Attachment 3:

Upload:
[ Browse... ]

CONFIDENTIAL

Case 4:14-cv-00783-DW   Document 157-1   Filed 05/08/15   Page 16 of 65   DNA_0004657

December 6, 2012

John A. Finnell

Complaint about Mass Street Group

In early October of this year I was in need of a small business start-up loan. After learning that my bank does not offer such loans I decided to search on the internet for a local institution that might help me and finding none I resorted to trying for a personal loan over the internet instead. I did apply for an unsecured loan with an internet company (I am not sure of the companies name but I think it was Springleaf). I remember that they offered unsecured loans up to $10,000 which is what I was interested in. Another product offered by this company was payday loans which I was not interested in. During the application process, I was asked to review and agree to the company's terms and conditions which included surrendering my rights to a trial by jury in settling any disputes with the company I was applying with and that they would share my application with other lending companies. After acknowledging the terms and conditions I clicked submit and was immediately told that I was approved for a $500 payday loan which I declined thinking that that was the end of the story. Later that day our email and my wife's phone (the application could not be submitted without a second phone number) were over-run with loan offers which I was no longer interested in. When I got around to balancing my checking account after the first of November, I noticed some unauthorized transactions in my account. A company named Mass Street Group had deposited $300 on 10/13/12 in my account and had since taken two refinance charges of $90 each on each of the two pay days (10/23 and 11/9). I went to my bank and had the two withdrawals stopped. I did not know this company and thought that they would contact me concerning the stopped transactions. I later noticed that I had 2 account statements from them in my email the first of which was dated 10/30/12 which was 17 days after they deposited the money in my account and 4 days after they deducted the first refinance charge. Now they tell me my account has been turned over to collections and that I must contact Customer Services @ Zardam.com. I have a feeling that this is about to get really ugly as I have told them that I am willing to return the $300 they deposited by certified check if they will tell me where to send it. To date they have not given me an address. Instead they keep saying I have to contact Customer Services @ Zardam. They have sent me an application that I allegedly filled out and agreed to the terms on. It contains mistakes that I would not have made and I certainly would never agree to a loan at 995.45% interest. I remember applying to Springleaf but not for a payday loan. They say that they contacted me to tell me that I had been approved and that someone would contact me, they would verify my employment data, they would verify my electronic signature, and then they would deposit the money. I have never spoken with anyone from Mass Street Group; however I did find the attached automated email in my junk email file on 12/5/12. Please note that this automate email states that I should; 1) Review loan documents using the link provided(the link doesn't work); 2)Wait for a loan rep to contact me via phone or email (never happened); 3)Wait for them to verify my electronic signature approval (approval of what?... Perhaps the loan documents from 1. Above); 4) Wait while they verify my income, pay dates, employment, and banking data (they would have to contact my employer to do that... this has not happened); 5) Wait for them to deposit money that I did not ask for into my bank account (why would anyone think that some loan institute would do that if they never did numbers 1 through 4 above?). Again, I have never agreed to a loan with them, I have never spoken to them, and I do not believe I owe them anything other than returning the money they deposited in my account without my knowledge.

In addition, we have begun receiving phone calls from Jeanna at Progressive who is saying on the messages she leaves that she knows where I live and work and is about to begin legal proceedings to have me arrested. When I Google Progressive I find that they are some entity that threatens people who have applied for payday loans even if they owe nothing... surprise, surprise.

I wish to return their money to them but they have to assure me that I will not be continuously harassed and they must tell me where to mail it. I will not allow them back into my bank account to withdraw the money themselves.

Can you help me? What are my options at this point?

CONFIDENTIAL



ATTORNEY GENERAL OF MISSOURI

JEFFERSON CITY

CHRIS KOSTER
ATTORNEY GENERAL

65102

P.O.Box 899
(573) 751-3321

February 18, 2013

Cutter Group L.L.C.
P.O. Box 411056
Kansas City, MO 64141

RE: Complaint No. CF-2013-02405          Ms. Missy Thompson

Dear Sir/Madam:

   The Missouri Attorney General's Office received the attached complaint about
your company. Please review this complaint and send a written response to this office
within 14 days. If this situation has already been resolved in a fair and appropriate
manner, please advise our office of that resolution. Include the above-referenced
complaint number in all correspondence.

   The information provided in the attached complaint is presented exactly as written
by the consumer.

Sincerely,

CHRIS KOSTER
Attorney General

*Carrie Ahart*

Carrie Ahart
Consumer Advocate
Consumer Protection Division

Enc.

CONFIDENTIAL

# Consumer Complaint Form



RETURN TO: Attorney General's Office
Consumer Protection Unit, PO Box 899
Jefferson City, MO 65102

**Missouri Attorney General**
**Chris Koster**

Phone: 800-392-8222
Web: www.ago.mo.gov

## CONSUMER INFORMATION

**NAME** Ms. Missy Thompson
**ADDRESS**
Ridge MO
**COUNTY** Suffolk
**HOME PHONE**
**WORK PHONE**
**E-MAIL**

## COMPANY INFORMATION

**NAME** Cutter Group L.L.C.
**CONTACT**
**ADDRESS** P.O. Box 411056
Kansas City MO 64141
**COUNTY**
**PHONE** 855-827-9836
**WEBSITE** 8003101477
**E-MAIL**

## TRANSACTION INFORMATION

**DATE OF TRANSACTION/PURCHASE** 12/14/2012   **AMOUNT PAID** $0.00   **PAYMENT METHOD** Other

**HOW AND WHERE DID YOU LEARN ABOUT PRODUCT OR SERVICE?**
Online

**DID YOU SIGN A CONTRACT, WARRANTY AGREEMENT OR SIMILAR PAPERS?**   No

**BRIEFLY EXPLAIN YOUR COMPLAINT**
I entered my information including bank account on a spider site that places you with loan companies. A representative called me shortly after. Had a cross conversation with a coworker while I was on the line then hung up. The next day 300 was in my account. I never signed off on any loan. Since this company has been calling and even left a threat including physical violence on my voicemail.

**WHAT ACTION HAVE YOU TAKEN TO RESOLVE THIS COMPLAINT?**
I called for a supervisor never get one

**HOW DO YOU WANT THIS COMPLAINT RESOLVED?**
Investigate Co. -

**HAVE YOU BEEN SUED OR FILED A LAWSUIT ABOUT THIS COMPLAINT?**   No

**NAME OF ANY AGENCY CONTACTED**
Cutter group

Ms. Missy Thompson

# CF-2013-02405

CONFIDENTIAL   Case 4:14-cv-00783-DW   Document 157-1   Filed 05/08/15   Page 20 of 65   DNA_0004844



**STATE OF ALABAMA**
**OFFICE OF THE ATTORNEY GENERAL**

**LUTHER STRANGE**
ATTORNEY GENERAL

501 WASHINGTON AVENUE
P.O. BOX 300152
MONTGOMERY, AL 36130-0152
(334) 242-7300
WWW.AGO.ALABAMA.GOV

January 11, 2013

Anasazi Group, LLL
ATTN LEGAL DEPT
PO Box 411056
Kansas City MO 64141

    Re: *__Bondurant, Vanessa__ (167046-001)*

Dear Sir or Madam:

  This is to advise you that the above-referenced complaint has been filed with the Attorney General's Consumer Protection Section regarding a transaction with you or your business. A copy of the complaint is enclosed for your review.

  In furtherance of the Attorney General's desire to informally assist consumers and businesses in resolving such disputes, it is requested that you reply in writing within fifteen (15) days of the date of this letter providing your position concerning the allegations of the complaint. Your reply allows the Attorney General to know the position of both parties before recommending, or determining, what action could amicably resolve the matter.

  Your cooperation in this effort is appreciated. If you feel you need to discuss the complaint before formally responding, you may contact the undersigned specialist at the number provided.

      Sincerely,

      Barbara D. Armstrong
      Consumer Specialist
Enclosure     (334) 242-7336

CONFIDENTIAL



# STATE OF ALABAMA ATTORNEY GENERAL'S OFFICE
## BUSINESS REPLY FORM
### CONSUMER PROTECTION SECTION

501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152

Telephone: (334) 242-7335
Fax: (334) 242-2433
www.ago.alabama.gov

167046-001

BDA

*PLEASE LIMIT ALL FAX TRANSMISSIONS TO 20 PAGES OR LESS*

*It is requested that all replies to the complaints be submitted on this form.*
*A copy of this reply will be sent to the consumer.*

1. Complete name of firm: _____

2. Principal office address: _____

3. Telephone number: _____

4. Fax number: _____

5. Corporation (Name of President or General Manager): _____

6. Partnership (Name of Partners): _____

7. Single Proprietorship (Name of Owner): _____

8. Name, address and telephone number of person to contact for additional information, if necessary:

9. Name of Complainant: _____

10. The complaint is:   True ( )        False ( )        Partially False ( )

11. Comments (*Use Additional Sheets if Necessary*)

Consumer-Business-Reply-Form - (Attach additional pages if needed)
Rev 12/11

Specialist: BDA
Matter Id: 167046-001    Page 1

CONFIDENTIAL
DNA_0004874

**Armstrong, Barbara**

| | |
|---|---|
| From: | server@ago.alabama.gov |
| Sent: | Wednesday, January 09, 2013 2:46 PM |
| To: | ConsumerProtection |
| Subject: | New consumer complaint |

submittedDate: 01/09/2013
Prefix: Ms.
FirstName: Vanessa
MiddleI:
LastName: Bondurant
Suffix:
Age: 53
Address1: ▮▮▮▮▮▮▮▮
Address2:
City: Birmingham
State: AL
Zip: ▮▮▮▮
HomePhone: ▮▮▮▮▮▮▮
WorkPhone:
EMail: ▮▮▮▮▮▮▮▮
AntiName: Anasazi Group LLL/ CWB Services LLC
AntiAddress1: P. O. Box 411056
AntiAddress2:
AntiCity: Kansas City
AntiState: MO
AntiZip: 64141
AntiPhone: 855-417-4417
DateOccur: 12/24/2012
Contract: No
InformFirm: Yes
ProductService: Fraudulent Payday loan
Amount: 300.00
Contacted: Other
Consult: No
ConsultName:
Court: No
CourtName:
Description: I received a email on Jan. 1 and on Jan. 6 stating that they appreciate my
business and that some type of attached form was there for me to sign. And when i opened the
attachment it was about a loan i never applied for, never gave any of my information, nor
agreed upon, nor had i applied for online. But they had most of my information like my ssn,
name, home address and my bank account number. And i never have applied, nor gave permission
or authorized for the loan. I didn't know anything about it, but now they are saying that i
have to pay this loan back or pay the interest. So my daughter began looking up information
on this company, since they said that the loan was applied for online and she could not even
find a web address for the company only telephone numbers and fax numbers, and looking at the
assumed application they sent, it states and i quote "We will contact you shortly. What we
will do"
1. We will email you and/or contact you by phone.
2. We will verify you electronic signature approval.
3. We will verify you income, pay dates, employment, bank routing number, and bank account
number.
4. We will deposit you funds electronically in your bank account."

1

CONFIDENTIAL
DNA_0004875

There is missing and incorrect information on the supposed application like Pay period, monthly take home pay and next pay dates and on top of it they never called to verify signature approval

this seems like a very fraudulent company and they are ripping people off not only in alabama but in other states as well as my daughter researched

Please help, i dont want to be a victim but i wouldn't want any one else to be one as well. Thank you and God bless
CLIENT_ADDRESS: ██████████
BROWSERTYPE: Mozilla/5.0 (compatible; MSIE 9.0; Windows NT 6.1; WOW64; Trident/5.0)

CONFIDENTIAL

DNA_0004876



**RICK SNYDER**
GOVERNOR

**DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS**
OFFICE OF FINANCIAL AND INSURANCE REGULATION
R. KEVIN CLINTON
COMMISSIONER

**STEVEN H. HILFINGER**
DIRECTOR

August 28, 2012

Vandelier Group
P O Box 411056
Kansas City, MO 64141

SUBJECT:  Consumer Services File Number:  129153-001
          Complainant:                    Ellis, Larhonda

Enclosed is a complaint that was received by our office, which indicates that you are operating as a deferred presentment service provider under the above name without a deferred presentment license as required under the Deferred Presentment Service Transactions Act (Act).  Pursuant to the records of the Office of Financial and Insurance Regulation, the above name(s) are <u>not</u> licensed, and are not authorized to act as a deferred presentment service provider as required by the Act.

**In response to this letter, you are requested to:**

1) Respond to each issue raised in the complaint and include all action you are taking to resolve the complaint, and
2) Submit a written statement to our office as to the activities being conducted under the above-mentioned name(s) and explain why the activity is being conducted prior to obtaining a license. Please visit our website at www.michigan.gov/ofir to obtain a copy of the Act and the appropriate applications for licensing.

Section 11(1) of the Act states, in pertinent part:

"A person shall not engage in the business of providing deferred presentment service transactions after June 1, 2006 without a license under this act.  A separate license is required for each location from which the business of providing deferred presentment service transactions is conducted."

And Section 48 (1) of the Act states, in pertinent part:

"If the commissioner finds that a person has violated this act, state or federal law, or an applicable rule or regulation, the commissioner may order the person to pay a civil fine of not less that $1,000.00 or more that $10,000.00 for each violation.  However, if the commissioner finds that a person has violated this act and that the person knew or reasonable should have known that he or she was in violation of this act, the commissioner may order the person to pay a civil fine of not less that $5,000.00 or more than $50,000.00 for each violation.  The commissioner may also order the person to pay the costs of the investigation."

Your response must be received in this office no later than **September 18, 2012**.  If you have any questions please contact the undersigned at (877) 999-6442.

Sincerely,

Kimberly Weber

Kimberly Weber, Analyst
Consumer Services

Enclosure

CONFIDENTIAL

DNA_0005133

# Michigan Office Of Attorney General Consumer Complaint Form

Web Complaint Number: 2012-cp08041455885-A          Submitted: 8/4/2012 2:55:40 PM

## Consumer Information

Your Last Name: Ellis                    First Name: Larhonda          M.I.:
Your Street Address: ██████████          City: Detroit
Your State: MI                           Zip Code: ██████
Your County: Wayne
Your Home Phone: ██████                  
Fax Number:                              Your Work Phone:              Ext.:
                                         E-mail Address: ██████

## Primary Company Or Person Your Complaint Is About

Company or Person? Company
Complainee Last Name:                    Complainee First Name:
Company Name: Vandelier Group
Street Address: Po Box 411056             City: Kansas City
State: MO                                Zip Code: 64141
County:                                  Phone: 8665646020
Fax Number:                              E-mail Address:
Web Site Address:                        Product Offered:
Primary Jurisdiction: None

## Secondary Company Or Person Your Complaint Is About

Company or Person? Company
Complainee Last Name:                    Complainee First Name:
Company Name: National Check Resolution
Street Address: Unknown                   City:
State: GA                                Zip Code:
County:                                  Phone: 8558679855
Fax Number: 6789059521                   E-mail Address: info@ncr10.com
Web Site Address:

## Motor Vehicle Warranty Complaint Information

Vehicle Make, Model, and Year:
Vehicle VIN No.:

## Complaint Information

Incident Date\Time: 6/1/2012 6:00:00 PM
Incident Location:
Approximate Monetary Value: $300.00
Did you sign a contract? False
Where did you sign this contract?
Is a court action pending? False
Do you have an attorney representing you on this matter? False
Are you willing to testify in court regarding this complaint? True
Did you complain directly to the business? True
What was the response from the business? That I was entitled to pay the loan
If no complaint was given to the business directly, why?
Was this complaint filed with any other agencies? False

CONFIDENTIAL
DNA_0005134

## Complaint Detail/Inquiry Information

The problem is this company placed an unauthorized deposit in my account. I did an online loan inquiry with a loan matching service and this company contacted me by email with loan terms. I declined, did not sign and fax back authorization. However, the next day there was a unauthorized deposit in my account for $300.00. Tried numerous phone and email attempts to get them to only take back the $300.00. 2 weeks later received email saying I was responsible to pay the loan and the excessive fees. Closed my account. Have been waiting for phone, or mail correspondence to pay money back. Now, I am getting threatening calls from a collection company named NCR. They state that civil charges are being filed against me and they are coming to my job, or home to serve me papers ASAP. They say my $300 unauthorized date is now over $800 and I will be put in jail. Called me every day this week and says the same thing. Caller is from Abagail Greene and usually calls from a restricted line but once she called from a cell <span style="background:black;color:black">████████</span>. Also making a police report for harassment. Still waiting for proper correspondence. Willing to pay the $300 but nothing more. Has never received a proper letter, or call to get this resolved.

---

[False] Check if this referral is just to give us information and you do not need us to respond to you directly.

[False] Check if you want to send documentation. After you submit this form you will be provided with a postal mail address, and facsimile number, to which you may send documents.

[True] Check if you want to sign up for the Consumer Protection Listserv.

[False] Check if you want to sign up for the AG Press Release Listserv.

[False] Check if you want to sign up for the Attorney General Opinions Listserv.

---

(*) I certify that the information on this form is true and accurate to the best of my knowledge.

(*) I consent to releasing to the Michigan Attorney General any information or document relative to the investigation of this complaint. By checking this box, I also certify that I have had the opportunity to review the Michigan Attorney General Privacy Policy before submitting this complaint.

---

# ATTACHMENT B

Atty. No. 41106

FILED · CH
CLERK OF THE CIRCUIT
CHANCERY
3:17

DOROTHY BROWN CLERK

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| KIMBERLY COLEMAN,<br>on behalf of plaintiff and a class, | )<br>) 13CH-09835<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| OREAD GROUP, LLC, d/b/a<br>MASS STREET GROUP; and<br>JOHN DOES 1-10; | )<br>)<br>)<br>) |
| Defendants. | ) |

### NOTICE OF FILING

TO:   Please see Certificate of Service.

        **PLEASE TAKE NOTICE** that on June 14, 2013, we caused to be filed with the Circuit Court of Cook County, Illinois, Municipal Department, First District, **PLAINTIFF'S FIRST AMENDED COMPLAINT**, a copy of which is attached and is hereby served upon you.

                                   _____
                                   Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Sharon Goott Nissim
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
Atty No. 41106

1

CONFIDENTIAL

DNA_0004928

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on June 14, 2013, I caused the preceding and aforementioned documents to be filed with Clerk of the Circuit Court and sent to a process server to be served upon the following:

Oread Group, LLC
c/o Nick Hillyard
Franke Shultz & Mullen
8900 Ward Parkway
Kansas City, MO 64114

Daniel A. Edelman

2

Atty. No. 41106

FILED

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| KIMBERLY COLEMAN,<br>on behalf of plaintiff and a class,<br><br>Plaintiff,<br><br>vs.<br><br>OREAD GROUP, LLC, d/b/a<br>MASS STREET GROUP; and<br>JOHN DOES 1-10;<br><br>Defendants. | )<br>)<br>)<br>)<br>) 13-CH-09835<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AMENDED COMPLAINT – CLASS ACTION

### INTRODUCTION

1.      Plaintiff Kimberly Coleman brings this action to secure redress from unlawful credit and collection practices engaged in by defendant Oread Group, LLC.

### JURISDICTION AND VENUE

2.      Venue and personal jurisdiction in this District are proper because defendant contacted plaintiff and other persons within this District for the purpose of making and collecting illegal debts.

### PARTIES

3.      Plaintiff is a resident of Tinley Park, Illinois.

4.      Defendant Oread Group, LLC is a limited liability company chartered under the law of Delaware.  Its registered agent and office is Incorp Services, Inc., 1201 Orange St., Suite 600, One Commerce Center, Wilmington, DE 19899.

5.      Defendant Oread Group, LLC makes or claims to make, under various names, high-interest consumer loans, at rates exceeding 700%.

6.      Defendant Oread Group, LLC makes or claims to make more than 26 loans per annum.

7.      Defendants John Does 1-10 are other entities and natural persons that participated

1

in the making and collection of loans to plaintiff and the class members.

<div align="center">

**FACTS**

</div>

8.     On or about March 1, 2013, plaintiff received an electronic deposit into her checking account of $300 from "Mass Street Group."

9.     On information and belief, "Mass Street Group" is one of many names used by Oread Group, LLC. On information and belief, others include All State Law Group of California, American Cash Payday Loan, CBS Services, and MassStreetGroup.com.

10.     Plaintiff was not aware of having agreed to any transaction which would result in such a deposit.

11.     Upon noticing the deposit in her bank records, plaintiff attempted to call the depositor, but was unable to reach anyone.

12.     On or about March 3, 2013, the next business day after the deposit was made, Plaintiff therefore advised her bank that her account had been compromised and instructed them to freeze the account.

13.     On or about March 5, 2013, plaintiff was contacted by "CWB Services LLC," by means of an email with the following text:

> Valued Customer:
> Attached you will find your account summary, on this document are your payment options and terms.  To initiate any payment option please contact us directly.
> Thanks,
> **CWB Services LLC**
> **Phone: 1-855-417-4421   Fax: 1-888-519-2058**

14.     CWB Services, LLC is a Missouri limited liability company that has provided operational assistance to various businesses, including Oread Group, LLC. On information and belief, all correspondence by CWB Services, LLC with plaintiff was undertaken at the direction of Oread Group, LLC.

15.     Plaintiff responded to this email by email with the following text:

<div align="center">

2

</div>

CONFIDENTIAL

"I did not request or authorize you to deposit in funds into my acct. I am refusing your loan agreement and terms."

16.    Thereafter, plaintiff received the "account summary" attached as <u>Exhibit A</u> from defendant.

17.    <u>Exhibit A</u> purports to describe the terms of a loan at 782.14% interest. Furthermore, the loan automatically renews unless the consumer elects otherwise.

18.    On or about March 11, 2013, plaintiff was contacted by "CWB Services LLC," by means of an email with the following text:

> 3/11/2013
> Re: Account Number �one
> Dear KIMBERLY,
> Your bank has returned your account to us as "ACCOUNT FROZEN". You need to call us immediately to make arrangements to settle you account with Mass Street Group. It is important for your future credit standing that you contact our office as soon as possible. If you fail to contact us regarding this matter we will be forced to report your outstanding account to the customer credit reporting agencies. Contact our office before 5:00pm CST to avoid any further action on your account.
>
> Thank you,
> **CWB Services LLC**
> **Phone: 1-855-417-4421   Fax: 1-888-519-2058**

19.    Plaintiff responded that she had not borrowed from the sender and that she was complaining about the incident to law enforcement agencies.

20.    CWB Services, LLC responded later on March 11, 2013 with the following explanation of how plaintiff supposedly agreed to a loan:

> Dear Kimberly
>
> Thank you for your reply. Again, the loan application in which you submitted via the world wide web authorizes our lender, Mass Street Group to deposit the requested funds into the bank account in which you provided on the application. Authorization is given via your legal e-signature. Once the application is received, your employment is verified and our processing department contacts you by phone at the home phone# listed on the application to advise you of the approval. You are also sent an email to the same effect the same day. Your email was sent to ▇▇▇▇▇▇▇▇▇ at 9:07AM CST. Once approved, the funds are deposited via ACH to the bank account you provided and are typically made available to you the next business day.

3

That said, at this point we are simply looking to collect only the original credit of $300.00 back from you. You are in your full legal right to dispute this loan, but you will still be required to return the funds. Your area's attorney general along with our local attorney general will tell you the same. We are more than willing to work with you to help you get the funds back to the lender, but will need your cooperation in this matter. Your returned reversal has been stopped from reprocessing tomorrow, 3/12/13 and to allow ample time for your response, we have also postponed your due date to 3/29/13. Please contact us using the phone# listed below at your earliest convenience to discuss your options in returning the credit. Thank you.

CWB Services LLC
Customer Service
Ph. 1.855.417.4421
FX: 1.888.519.2058
Hours of Operation: M-F 8am–5pm, CST

21. Plaintiff responded as follows:

No one was authorized to deposit any funds into my account without my express permission. Regardless to the website that I initially applied to, you have to have my permission and agreement to do business with you. You cannot just deposit funds into my account and notify me 3 days later via email. That is unacceptable. No other company that contacted me did this. I assure you this practice is not a healthy way to do business, and I intend on persuing [sic] this issue to the fullest extent of the law. I had multiple companies send me quote,s [sic] and offers to further apply for a loan. No one deposited funds into my account without me first saying I would accept the funds and an esignature was required. I did not do such a thing with your company. I would have never and did not agree to accepting $300.00 from your company. My looking for a loan did not authorize anyone to deposit funds into my account without my consent period.

22. On March 12, 2013, defendant sent this email to plaintiff:

Thank you for providing us with that information. As a reminder, all notifications of your approval are sent the day your application is approved (3/1/13). Your email notification was sent on 3/1/13 at 9:07am CST to ▇▇▇▇▇▇▇▇▇▇▇. This email stated clearly that to cancel this loan, you must notify us immediately. Again, whether you were aware of it or not, you fully authorized us to make the deposit when you submitted the application on the web. Simply because you were unaware of the terms on the website in which you applied does not void out these terms and conditions. We truly apologize for any inconvenience that this may have caused.

With that said, we are still only looking to collect the funds that we provided to you in your time of need. Despite you keeping and utilizing our funds, we will not hold you responsible for doing so, but still need for you to return the funds to us. We can reverse the credit directly back out of your account or we can give you instruction for money order payment. Please let us know how you would like to proceed. Thank you.

23. Plaintiff responded as follows:

4

There was no email sent to me on 3/1/2013. The next correspondence will be from my attorney.

Thank You.

24.     There are numerous complaints on the Internet about similar actions on the part of defendant. Examples (from http://www.online-payday-loans.org) follow:

     a.    Update August 30, 2012. We received allegations that tie this entity to CWB Services: "I went online to check my balance on my Checking Account, saw that there was more then what my direct deposit should've been after I figured in the balance before my direct deposit. Went to my bank and they told me that some company called Mass Street Group had deposited $300.00 into my account. Came home and called them up, after making two phone calls with them I finally got ahold of a Jenny L with CWB Services. After I told her I did not authorize a loan she stated that they would reverse it tomorrow 8/31/2012, got an email that confirmed that the loan will be reversed. I told her there better not be more then $300.00 taken out of my account, she assured me that there will not be. I already contacted my bank to let them know that, and to make sure all they take out is the $300.00."

     b.    On December 20, 2012, we received the following allegations from a kind reader: "Lady by the name of Alison D. from cwbservices.net sent me an email on December 5, 2012, stating that I was approved for a $200 loan from her lender – Mass Street Group. The email said it was to be deposited into my account that night at midnight – which I never authorized! Sure enough it was in my account after midnight, for the $200. The customer service phone number that was listed on the loan documentation that was sent to me is (855) 417-4421, I tried calling it but was placed on hold FOREVER! Does anyone know if this is the same company and is it a scam/fraud???"

     c.    On February 26, 2013, we received the following allegations against Mass Street Group AKA CBS Services (new alias or misspelling of CWB Services?): "On February 22, 2013, I was contacted by CBS Services about a loan approval for $300. I never requested a loan from them. After many unanswered phone calls, I was able to cancel this unwanted loan. Then on February 25, 2013, the same thing happened but this time money was deposited into my account on February 26, 2013. Now I have to go to the bank and change my checking account number."

25.     Defendant's method of doing business:

     a.    Results in the making of purported loans that have not been agreed to in

              any meaningful sense;

     b.    Results in the making of purported loans without the provision of Truth in

<div align="center">5</div>

CONFIDENTIAL

DNA_0004934

Lending disclosures to the "borrower" prior to the loan being disbursed.

26.     Loans of the sort claimed to have been made are made for personal, family or household purposes and not for business purposes. Plaintiff had no business purpose for inquiring about a loan.

27.     Oread Group, LLC was never licensed to make loans of any type by the Illinois Department of Financial and Professional Regulation.

28.     All loans made or claimed to have been made by Oread Group, LLC to Illinois residents were made at an annual percentage rate exceeding:

        a.     The 9% which a non-bank lender which does not have a license from the Illinois Department of Financial and Professional Regulation may charge for a loan made to an Illinois resident. 815 ILCS 205/4.

        b.     The $15.50 per $100 loan allowed to a licensee under the Illinois Payday Loan Reform Act, 815 ILCS 122/2-5;

        c.     The 20% specified in the Illinois criminal usury statute, 720 ILCS 5/17-59, formerly 720 ILCS 5/39-1 et seq.

29.     815 ILCS 205/4 provides:

**815 ILCS 205/4.  General interest rate**

> **Sec. 4. General interest rate. (1) Except as otherwise provided in Section 4.05 [815 ILCS 205/4.05], in all written contracts it shall be lawful for the parties to stipulate or agree that 9% per annum, or any less sum of interest, shall be taken and paid upon every $ 100 of money loaned or in any manner due and owing from any person to any other person or corporation in this state, and after that rate for a greater or less sum, or for a longer or shorter time, except as herein provided. . . .**

30.     The Payday Loan Reform Act provides, at 815 ILCS 122/2-5, as follows:

> **. . . (e) No lender may charge more than $ 15.50 per $ 100 loaned on any payday loan over the term of the loan. Except as provided in Section 2-25 [815 ILCS 122/2-25], this charge is considered fully earned as of the date on which the loan is made.**

31.     720 ILCS 5/17-59, formerly 720 ILCS 5/39-1 et seq., states:

> **§ 17-59. Criminal usury.**

6

CONFIDENTIAL

DNA_0004935

(a) A person commits criminal usury when, in exchange for either a loan of money or other property or forbearance from the collection of such a loan, he or she knowingly contracts for or receives from an individual, directly or indirectly, interest, discount, or other consideration at a rate greater than 20% per annum either before or after the maturity of the loan.

(b) When a person has in his or her personal or constructive possession records, memoranda, or other documentary record of usurious loans, the trier of fact may infer that he or she has violated subsection (a) of this Section.

(c) Sentence. Criminal usury is a Class 4 felony.

(d) Non-application to licensed persons. This Section does not apply to any loan authorized to be made by any person licensed under the Consumer Installment Loan Act or to any loan permitted by Sections 4, 4.2 and 4a of the Interest Act or by any other law of this State.

32.    In addition, because the purported loan was "made" by an unlicensed party, it was void under the Illinois Consumer Installment Loan Act, 205 ILCS 670/20(d), which provides:

(d) Notwithstanding any other provision of this Section, if any person who does not have a license issued under this Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.

33.    Defendant nevertheless represents that consumers are obligated to repay the loans. Such statements are false.

34.    The Illinois Department of Financial and Professional Regulation has posted notices on its Web site concerning the making of payday and high-interest loans to Illinois residents by unlicensed lenders located in other states and foreign countries, along with at least one order finding that such unlicensed loans were unlawful (See Exhibits B-E).

### COUNT I – CONSUMER INSTALLMENT LOAN ACT

35.    Plaintiff incorporates paragraphs 1-34.

36.    All loans made by Oread Group, LLC since five years prior to the date the complaint was filed are unenforceable under 205 ILCS 670/20(d), any amounts disbursed to borrowers are not recoverable, and borrowers are entitled to recovery of all amounts paid.

37.    Plaintiff is entitled to sue to enforce such prohibition under 205 ILCS 670/20.7.

7

CONFIDENTIAL

## CLASS ALLEGATIONS

38.     Plaintiff brings this claim on behalf of a class.

39.     The class consists of (a) all individuals (b) with Illinois addresses (at the time the loan was made) (c) to whom defendant made or from whom defendant collected a purported loan (d) at more than 9% interest (e) at any time on or after a date 5 years prior to the date of filing this action.

40.     The class is so numerous that joinder of all members is not practicable.

41.     On information and belief, there are at least 40 individuals with Illinois addresses (at the time the loan was made), to whom defendant made or from whom defendant collected a purported loan, at more than 9% interest, at any time on or after a date 5 years prior to the date of filing this action.

42.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether defendant made and collected loans that are void.

43.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

44.     A class action is appropriate for the fair and efficient adjudication of this matter, in that:

    a.      Individual actions are not economically feasible;

    b.      Members of the class are likely to be unaware of their rights.

    WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendant for:

        i.      A declaration that the purported loans of plaintiff and the class members are void;

        ii.     A declaration that plaintiff and the class members are entitled to

8

CONFIDENTIAL

DNA_0004937

keep all amounts received from defendant, and disgorgement of all

amounts obtained by defendant on account of such loans;

iii.    Injunctive relief against collection of loans from Illinois residents;

iv.    Costs of suit;

v.    Such other and further relief as the Court deems proper.

## COUNT II – INTEREST ACT

45.    Plaintiff incorporates paragraphs 1-34.

46.    Oread Group, LLC is liable for statutory damages under 815 ILCS 205/6, which

provides:

**815 ILCS 205/6. [Receipt of unlawful interest, discount of charges; acts done in good faith]**

**Sec. 6. If any person or corporation knowingly contracts for or receives, directly or indirectly, by any device, subterfuge or other means, unlawful interest, discount or charges for or in connection with any loan of money, the obligor may, recover by means of an action or defense an amount equal to twice the total of all interest, discount and charges determined by the loan contract or paid by the obligor, whichever is greater, plus such reasonable attorney's fees and court costs as may be assessed by a court against the lender. The payments due and to become due including all interest, discount and charges included therein under the terms of the loan contract, shall be reduced by the amount which the obligor is thus entitled to recover. Recovery by means of a defense may be had at any time after the loan is transacted. Recovery by means of an action may be had at any time after the loan is transacted and prior to the expiration of 2 years after the earlier of (1) the date of the last scheduled payment of the loan after giving effect to all renewals or extensions thereof, if any, or (2) the date on which the total amount due under the terms of the loan contract is fully paid. A bona fide error in connection with a loan shall not be a violation under this section if the lender corrects the error within a reasonable time.**

**No person shall be liable under this Act for any act done or omitted in good faith in conformity with any rule, regulation, interpretation, or opinion issued by the Commissioner of Banks and Real Estate or the Department of Financial Institutions or any other department or agency of the State, notwithstanding that after such act or omission has occurred, such rule, regulation, interpretation, or opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.**

## CLASS ALLEGATIONS

47.    Plaintiff brings this claim on behalf of a class.

9

CONFIDENTIAL

48.     The class consists of (a) all individuals (b) with Illinois addresses (at the time the loan was made) (c) to whom defendant made or from whom defendant collected a purported loan (d) at more than 9% interest (e) that was outstanding 2 years prior to the date of filing this action.

49.     The class is so numerous that joinder of all members is not practicable.

50.     On information and belief, there are at least 40 individuals with Illinois addresses (at the time the loan was made), to whom defendant made or from whom defendant collected a purported loan, at more than 9% interest, at any time on or after a date 2 years prior to the date of filing this action.

51.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether defendant made and collected loans that are void.

52.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

53.     A class action is appropriate for the fair and efficient adjudication of this matter, in that:

        a.     Individual actions are not economically feasible;

        b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendant for:

        i.      Statutory damages;

        ii.     Attorney's fees, litigation expenses and costs of suit;

        iii.    Such other and further relief as the Court deems proper.

### COUNT III – PAYDAY LOAN REFORM ACT / CONSUMER FRAUD ACT

54.     Plaintiff incorporates paragraphs 1-34.

10

CONFIDENTIAL

DNA_0004939

55. The Payday Loan Reform Act imposes limitations on the number and amount of payday loans for which a consumer may be obligated as well as the consideration that a payday lender may obtain. 815 ILCS 122/2-5 provides:

> . . . (e) No lender may charge more than $ 15.50 per $ 100 loaned on any payday loan over the term of the loan. Except as provided in Section 2-25 [*815 ILCS 122/2-25*], this charge is considered fully earned as of the date on which the loan is made.

56. The Payday Loan Reform Act imposes limitations on the consideration a payday lender may obtain from a borrower. 815 ILCS 122/2-10 provides:

> Sec. 2-10. (a) If there are insufficient funds to pay a check, Automatic Clearing House (ACH) debit, or any other item described in the definition of payday loan under Section 1-10 [*815 ILCS 122/1-10*] on the day of presentment and only after the lender has incurred an expense, a lender may charge a fee not to exceed $ 25. Only one such fee may be collected by the lender with respect to a particular check, ACH debit, or item even if it has been deposited and returned more than once. A lender shall present the check, ACH debit, or other item described in the definition of payday loan under Section 1-10 for payment not more than twice. A fee charged under this subsection (a) is a lender's exclusive charge for late payment.

> (b) Except for the finance charges described in Section 2-5 [*815 ILCS 122/2-5*] and as specifically allowed by this Section, a lender may not impose on a consumer any additional finance charges, interest, fees, or charges of any sort for any purpose.

57. The Payday Loan Reform Act imposes limitations on rolling over or refinancing loans. 815 ILCS 122/2-30 provides:

> Sec. 2-30. Rollover of a payday loan by any lender is prohibited. This Section does not prohibit entering into a repayment plan, as provided under Section 2-40 [*815 ILCS 122/2-40*].

58. This restriction followed studies showing that payday loans were repeatedly "rolled over" or refinanced, trapping consumers in a "cycle of debt."

59. The Payday Loan Reform Act prohibits, at 815 ILCS 122/4-5, "(2) Using any device or agreement that would have the effect of charging or collecting more fees or charges than allowed by this Act, including, but not limited to, entering into a different type of transaction with the consumer" and "(7) Charging any fees or charges other than

11

CONFIDENTIAL

DNA_0004940

those specifically authorized by this Act."

60. The Payday Loan Reform Act defined a "payday loan" in 815 ILCS 122/1-10, as **"a loan with a finance charge exceeding an annual percentage rate of 36% and with a term that does not exceed 120 days . . . ."**

61. All loans made by defendant to Illinois residents had an annual percentage rate in excess of 36% and a term of less than 120 days.

62. 815 ILCS 122/1-15 provides:

> **Sec. 1-15. (a) Except as otherwise provided in this Section, this Act applies to any lender that offers or makes a payday loan to a consumer in Illinois.**
>
> **(b) The provisions of this Act apply to any person or entity that seeks to evade its applicability by any device, subterfuge, or pretense whatsoever. . . .**

63. Oread Group, LLC contracted for and collected finance charges, interest, and fees, from Illinois residents, beyond the one-time charge of $15.50 per $100 authorized by 815 ILCS 122/2-5, on payday loans.

64. All such additional finance charges, interest, fees, and charges are unlawful and unenforceable.

65. The loans providing for such additional finance charges, interest, fees and charges are unlawful and unenforceable.

66. Under 815 ILCS 122/4-10(b), any material violation of the Payday Loan Reform Act constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

67. In addition, defendant engaged in deceptive practices in violation of 815 ILCS 505/2, in that defendant made "loans" to consumers when they had not agreed to the terms.

68. Defendant also engaged in unfair practices in violation of 815 ILCS 505/2, in that it made loans on terms that violated Illinois criminal law, contrary to the public policy of the state.

69. Any person purportedly obligated on a loan from defendant suffered economic

12

injury.

70.    Defendant engaged in such conduct in the course of trade and commerce.

71.    Defendant engaged in such conduct for the purpose of imposing purported obligations on plaintiff and class members.

## CLASS ALLEGATIONS

72.    Plaintiff brings this claim on behalf of a class.

73.    The class consists of (a) all individuals (b) with Illinois addresses (at the time the loan was made) (c) to whom defendant made or from whom defendant collected a purported loan (d) at more than 9% interest (e) at any time on or after 3 years prior to the date of filing this action.

74.    The class is so numerous that joinder of all members is not practicable.

75.    On information and belief, there are at least 40 individuals with Illinois addresses (at the time the loan was made), to whom defendant made or from whom defendant collected a purported loan, at more than 9% interest, at any time on or 3 years prior to the date of filing this action.

76.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether defendant made and collected loans that are void.

77.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

78.    A class action is appropriate for the fair and efficient adjudication of this matter, in that:

        a.    Individual actions are not economically feasible;

        b.    Members of the class are likely to be unaware of their rights.

        WHEREFORE, the Court should enter judgment in favor of plaintiff and the class

13

CONFIDENTIAL

DNA_0004942

and against defendant for:

    i.    A declaration that the purported loans of plaintiff and the class members are void;

    ii.    A declaration that plaintiff and the class members are entitled to keep all amounts received from defendant, and disgorgement of all amounts obtained by defendant on account of such loans;

    iii.    Punitive damages;

    iv.    Injunctive relief against further lending to or collection of loans from Illinois residents;

    v.    Attorney's fees, litigation expenses and costs of suit; and

    vi.    Such other or further relief as the Court deems proper.

_____
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Sharon Goott Nissim
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@cdcombs.com

### NOTICE OF LIEN AND ASSIGNMENT

    Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a Court awards. All rights relating to attorney's fees have been assigned to counsel.

_____
Daniel A. Edelman

14

CONFIDENTIAL

DNA_0004943

# ATTACHMENT C

1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI

2

                    --------

3

4 FEDERAL TRADE COMMISSION,   )
                        )

5     Plaintiff,         )
                        )

6 vs.                 )    4:14 CV-000783-W-DW
                        )

7 CWB SERVICES, LLC, et al.,  )
                        )

8     Defendants.        )

9

10

11

12         DEPOSITION OF DAVID A. HARBOUR
       TAKEN ON BEHALF OF THE PLAINTIFFS
13             APRIL 7, 2015

14

15

16

17       R. Patrick Tate, MO-CCR, KS-CSR
          Missouri CCR NO. 1239
18
          Tricia Dee Tate, MO-CCR
19         Missouri CCR NO. 1240

20

21

22

23

24

25

1    Q    So I'm just going to ask you a little bit

2 about how you first got to know Ted Rowland.  When did

3 you first meet him?

4    A    His wedding.

5    Q    Okay.  When was that?

6    A    I don't remember.

7    Q    Maybe ten years ago?

8    A    '90s, maybe, maybe the '90s.

9    Q    So did you have a personal relationship with

10 him?

11    A    No.

12    Q    And what brought you to attend his wedding?

13    A    My childhood friend is his brother-in-law.

14 His sister's brother -- I'm sorry, his wife's brother.

15    Q    Wife's brother?

16    A    Yeah.

17    Q    Okay.  And did you -- it looks like from what

18 we've reviewed, you may have started talking to him

19 about his company HuskHawk at some point in 2007, does

20 that sound right?

21    A    That sounds right.

22    Q    Did you have any kind of professional

23 dealings with him before that point?

24    A    No.

25    Q    And do you recall Mr. Rowland coming to you

1    Q    What is its purpose?

2    A    I do not know.

3    Q    Okay.  So you raised money for a company and
4 you don't know what the company did with the money?

5    A    You are correct.

6    Q    Can you tell me why you would do that?

7    A    So KSQ, it's a long answer -- so I have to
8 back up then.

9    Q    Sure.

10    A    So Joel came, saw that I was introducing Ted
11 Rowland to my investment group --

12    Q    Uh-huh.

13    A    -- and asked if he -- if I would introduce
14 him, being Joel, to my investment group.  And I said
15 yes.

16        But, you know, for what purpose, you know?

17        And the KSQ -- I said to Joel, Are you
18 looking at a few million dollars like for Ted, and he
19 said, No, I'm looking at -- I would like to raise a
20 lot of money, $30 million.

21        I said, Okay.  Well, Ted -- Ted was just an
22 anomaly, I mean, it was -- the only reason I'm a
23 67 percent owner is because one of the investors
24 wanted me in in case Ted got hit by a bus.  That was
25 really it.  It was, Here, Ted, meet this guy, you

1 know, Kenny Bobrow, meet Melvin Dunsworth, meet Daryl

2 Deel and I'm out.  I mean, Ted went to Joplin,

3 Missouri; he met with the guys on his own; talked to

4 them on his own; he went to Arizona, met with Kenny

5 Bobrow.  I wasn't in the room.  He met with them on

6 his own.  It was literally, Here, go, go on and have

7 your discussion.

8     Q    Can I interrupt you for one second?

9     A    Yeah.

10     Q    Who was it that wanted you to be a two-thirds

11 owner?

12     A    I think it was Kenny or Melvin.  I don't

13 remember.  I don't remember.  I don't want to -- and

14 literally it was for a hundred percent the purpose of

15 if something happens to Ted.

16          And so -- and it wasn't they wanted me to be

17 a two-thirds owner, I want to be clear on that; it was

18 just be an owner.

19          And Ted called me and said, I want to discuss

20 your compensation.  And I thought it's probably going

21 to be a typical 80/20 deal, a Wall Street deal, you

22 know, and he said to me, I'm thinking how about

23 67 percent for you?  And I was like, Okay.  Yeah, I

24 mean, I'm not going say no.  I mean, so -- if that's

25 what he wants to pay me.

1        So that's why it became 67 percent, and so
2 the concept was I would be on there if something
3 happened to Ted to liquidate the portfolios.

4        And then when he said, and I -- I cannot tell
5 you if I was paid 67 percent sitting here right now, I
6 have no idea, I can't tell you.  I can tell you what
7 he paid me, but I have no idea if that's 67 percent.

8        I don't know -- in fact, one of the things
9 that I would love to know from Mr. Cook is the
10 paperwork.  I honestly can tell you right now, I don't
11 know if he was profitable, I don't know what his
12 revenue was, I don't know what his cash flows were, I
13 don't know any of that stuff.

14        So 67 percent of the ownership -- I mean,
15 I've now found out that Ted made payments on a house
16 deal that potentially was out of the company.  There's
17 so many questions I have, I -- that I'm learning
18 through these reports from either Mr. Cook or from the
19 allegations that you guys have in your lawsuit, I'm
20 learning, just so you know.

21        But -- so back to Joel.  The comment to Joel
22 was if you want to raise this much money, that's what
23 you want us to do -- now, hindsight of course is 20/20
24 right?  But we're going to need personal guarantees
25 and we're going to need to understand, you know, how

1          So it would have been '12, because the

2    financials, right, we tried to get -- because what

3    triggered everything was my K-1 was so bad.

4          And then when we when I asked him for

5    documents, they didn't match, and so -- and then I

6    remember the 1099s for Darrel or somebody were

7    completely wrong, and so that's when we started going,

8    Okay, getting involved in the financials, so maybe '12

9    or -- somewhere in 2012.

10   Q    (By Ms. Unruh)  Okay.

11   A    And we still didn't get the financials.  He

12   still never provided them.

13   Q    I mean given your, your majority ownership

14   couldn't you have, I mean, how is it that he could

15   control that information?

16   A    So you're -- your looking at -- sorry,

17   they're washing windows behind you -- you're looking

18   at it as a 67, 67 or 66.7 majority ownership.  That

19   was never the deal.  The deal was just a 67 percent

20   split.  It was never like, Okay, you know, you own 67

21   and I own 33, it was never that way, it was just I'm

22   giving you this money.

23         And so it was never as if I was an owner,

24   that was never the -- I mean, I understand per the

25   agreement, I was an owner operator, obviously, sitting

1  here, right?  But it was never -- that was never the

2  idea.  It was Ted -- Ted did everything, and so I -- I

3  would have to go to him and ask him questions for

4  things.

5       Q    But legally, if you are a two-thirds owner,

6  shouldn't you have the ability to access bank accounts

7  and financial statements of the L.L.C.?

8            MR. SCHIRGER:  Object to the form and lack of

9  foundation, calls for a legal conclusion.

10      A    To answer that, I don't know.  Because I

11 don't know what a bank can or can't give me.

12 Honestly, I don't know if I went in there and said --

13 because I wasn't a signer on any of the accounts, so I

14 don't know if I could just say, Hey, I own 67 percent

15 of this company, you know, never did that, so I don't

16 know the answer to that.

17      Q    (By Ms. Unruh)  Is there a reason you didn't

18 try to do that?

19      A    It just wasn't my deal.  I wasn't that -- I

20 wasn't part of that.  That was Ted's job.  I mean, he

21 was -- he was the one to provide financials and do the

22 accounting and do the books and records, and that's

23 what he was supposed to do.

24           And as we started asking questions on it,

25 we've never gotten any answers.  So I've learned more

1    A    No, never.

2    Q    And I think you testified before that's not

3 something that you would have asked to review, the

4 consumers' loan documents?

5    A    I never would have, correct.

6         THE WITNESS:  I have a question for you.

7         MR. SCHIRGER:  Later.

8         THE WITNESS:  Okay.

9         MS. UNRUH:  We can put that aside.  And I

10 just want to try to understand a little more about how

11 DNA and Canyon Road and the lending entities sort of

12 all worked together, if we could please mark this as

13 Exhibit 5.

14              (Deposition Exhibit No. 5 marked.)

15    Q    (By Ms. Unruh)  So this than an e-mail from

16 Ted Rowland to -- I believe bigduns is Melvin

17 Dunsworth's e-mail, correct?

18    A    Uh-huh.

19    Q    And copying you.  Do you recall -- or I guess

20 I should say, did you and Melvin and Ted met with Joel

21 Tucker around this time of February 2011?

22    A    I don't remember.  I would doubt it.  I was

23 never, ever in Kansas City.  So I would say no.

24    Q    When you say you were never in Kansas City --

25    A    I didn't come here very often.

1    Q    And where did you hear about the fact that
2  there were consumer complaints?

3    A    Ted would forward me e-mails from John Mullen
4  regarding the complaint.  That's when I asked let's
5  have a phone call with John to figure out what is
6  going on.  I was never listed in any of them, so I
7  didn't look at it as I was involved.

8    Q    Was the entities that DNA was an owner of
9  listed?

10   A    Probably.  I'd have to go back and look, you
11  know.

12   Q    Did you review the actual complaint's --

13   A    No.

14   Q    -- from consumers?

15   A    No, I looked at it because John told me they
16  were fine.  And specifically John pointed me -- or Ted
17  pointed me to a letter that John Mullen sent to the
18  state attorney general in New York that said, Look,
19  here's -- John said to the attorney general of New
20  York:  They've done nothing illegal here, these loans
21  are legal, but we're going to settle.

22        So I said, Okay, well, that must be a part of
23  doing business and John Mullen is an attorney, he
24  knows the business and he's telling us that it's
25  legal.  Okay?

1    A    No, not that I did anything.  So when -- I

2 mean, in October -- August of 2013, when this

3 happened, I had -- Ted was not a concern.  I mean, it

4 wasn't like I was -- I was done with Ted.  I mean, I

5 raised the money for him, introduced him, I was done.

6 I didn't --

7    Q    What does that mean exactly?

8    A    I didn't consider myself being a part of any

9 of his operations or anything with him.  I didn't -- I

10 never considered myself -- Ted's whole deal for me,

11 I'm going to introduce you to people to raise money,

12 you go do your deal.  That's always the way it was.  I

13 pretty much mentally checked out with Ted, as did my

14 investors, as far as I knew, in November of 2011.

15    Q    But financially not checked out, right?

16    A    Right.  So that was part of the deal, he

17 still paid me, that's correct.  But from a standpoint

18 of the group who had given money to Ted was now going

19 to give money to Joel.  So our underlying asset for

20 Joel was his personal guarantee.

21        The diligence that people had done on the

22 various things that Joel was doing was not -- it was

23 more of a character type diligence, not necessarily a

24 company diligence or per investment or what the money

25 might be going to.

1    Q    Sorry.  Just so understand, do you mean that

2 he would want more information or less about what he

3 was investing in?

4    A    He would want to speak directly to Ted and

5 understand what Ted is doing as opposed to just

6 looking at a PowerPoint presentation and saying, Oh,

7 you know.  So that presentation was more Ted asking

8 me, and I said, Do you have any materials to show for

9 it?

10    Q    Uh-huh.

11    A    And he said, No, and that was me kind of

12 helping him go, you know, raise money, if you will.

13    Q    Okay.  Did you have -- so when you were first

14 talking to investors about this opportunity, how did

15 you describe it to them before they ever met Ted?

16    A    They would -- to answer that, they would

17 never call themselves investors, just so we all know.

18 They all considered themselves lenders, and so do we.

19         But I would call and say, There is an

20 opportunity for you to be a lender to a guy named Ted

21 Rowland.  It's in the payday lending space and it pays

22 anywhere from, you know, 18 to 25 plus percent and

23 here's Ted's telephone number.  Here's how I know Ted.

24 It's my best pal's brother-in-law, and are you

25 interested?

1 me because I'm very upset about how I was treated by

2 Tim Rowland and Tim Coppinger.

3    Q    Do you -- I think we talked about they did

4 send you, or either CWB or Ted did send you obviously

5 some of the complaints that we talked about.  I mean,

6 do you -- do you think that you had some

7 responsibility to read those complaints and act on

8 them --

9          MR. SCHIRGER:  Object to form and lack of

10 foundation.

11    Q    (By Ms. Unruh)  -- as the -- as the majority

12 owner of the lending entity?

13          MR. SCHIRGER:  Same objection.

14    A    I never considered myself a majority owner of

15 the companies to the fact that I had anything to do

16 with the operations.  And I don't think anyone you

17 would talk to who gave money would ever believe that I

18 had anything to do with it.

19          So to your answer your question, no, I did

20 not believe that.  And even if I brought that up,

21 which maybe I didn't do a good enough job of

22 specifically asking the question to Mullen of a

23 specific complaint that you just showed me and that,

24 yes, I was copied on and didn't read, but I did ask

25 him overall that there's all these complaints and he

1  because you asked me in the beginning when I formed

2  DNA Investments in the summer, I think, of 2010, was

3  it specifically for this deal, and no.  We weren't --

4  I mean, this wasn't -- we didn't do Ted's deal until

5  May the next year, or April, somewhere in that time

6  frame.  So it was just set up just as a -- to do

7  investments.

8      Q     Well, I think the Anasazi and Canyon Road

9  were set up in January 2011.

10     A     As DNA you mean?

11     Q     Right.

12     A     But I'm saying in 2010, in August, I wasn't

13 saying -- my thought wasn't, Oh, I'm creating this LLC

14 to be owner of -- you know, I was never going to be an

15 owner.  I was never -- that was never, ever part of

16 the conversation with Ted that I was going to be an

17 opener of the LLCs, never.

18     Q     What do you mean it wasn't --

19     A     When Ted and I were having conversations, it

20 was I was going to be paid a referral fee for Ted for

21 introducing him to people.  And this -- and that split

22 was going to be 67 percent.

23           Ted then took that when I said to be a part

24 of the operating, he went ahead and made me a

25 67 percent owner.  That wasn't -- I didn't go into it

1    Q    I think she was on it for quite a few years.

2    A    So when we first set it up, but I didn't

3 realize that she was.  I didn't -- in hindsight, I

4 would have never been a 67 percent owner of the LLCs

5 and I wouldn't, would not have used one that she was a

6 signor.  She doesn't have anything to do with the

7 business.

8    Q    Was -- I mean, did you -- when did you learn

9 that she was a signatory?

10   A    In the last few months since September 10th.

11   Q    Did you review the DNA bank accounts, bank

12 statements prior to that time?

13   A    For what purpose?

14   Q    To see who was taking money out of the bank

15 account.

16   A    I mean, the -- you know, the office would do

17 financials and the CPA would report it on that side,

18 but it wasn't like I needed to look and see if

19 somebody was taking money out of the account.

20   Q    So if your wife was writing checks out of

21 DNA, you wouldn't have known that until a few months

22 ago?

23   A    Well, it's not as if I needed to question my

24 wife on what she was doing with our money.

25   Q    I guess I'm just trying to understand so you

1 didn't know your wife was a signatory.  Did you know

2 that she was writing checks from the DNA account?

3      A    I did not remember that she had written any

4 checks.  I still -- when I was told that via the

5 receiver that, I still am trying to find those checks

6 that she wrote, just for the purpose of what it was.

7      Q    Are you aware of her using the DNA account

8 for any personal expenses?

9      A    Well, if she's writing a check, it's probably

10 for personal expenses.

11      Q    I was going to ask you -- I'm not going to

12 ask about conversations with your wife.  I mean, those

13 are -- that's an example of something I would probably

14 like to talk to you again about once you've had a

15 chance to review it, review the bank statements to

16 understand what was going in and out of the DNA bank

17 account.

18           Do you know what company had all the kind of

19 personal data of the consumers who had loans with the

20 big five?

21           MR. SCHIRGER:  Object to the form.

22      A    No, I do not know the answer to that.

23      Q    (By Ms. Unruh)  If you wanted to find out

24 who the borrowers were on a particular portfolio, who

25 would you have asked?

1                    CERTIFICATE

2        STATE OF MISSOURI        )
                                  )   SS.
3        COUNTY OF JACKSON        )

4

5            We, R. PATRICK TATE and TRICIA DEE TATE,
         certified Court Reporters, do certify that
6        pursuant to Notice and Subpoena, at the Offices of
         Lathrop & Gage 2345 Grand Avenue, Suite 2200,
7        Kansas City, Missouri,

8

9                    DAVID A. HARBOUR

10
         came before us, was duly sworn to testify
11       the whole truth of his knowledge of the matters
         in controversy aforesaid, was examined and his
12       examination then written in shorthand by us and
         afterwards typed, the reading and the signing
13       of the deposition being expressly requested by
         witness, and said deposition is herewith
14       returned.
             I further certify that I am not
15       counsel, attorney, or relative of either party,
         or clerk or stenographer of either party, or
16       otherwise interested in the event of this suit.

17

18           IN TESTIMONY WHEREOF, we have hereunto set our
         hands and seals this 8th day of April, 2015.
19


                         _____
                         R. Patrick Tate
                         Missouri C.C.R. 1239


                         _____
                         **Tricia D. Tate**
                         Missouri C.C.R. 1240
20

21

22

23

24
25

# ATTACHMENT D

**1**

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION
 3
 4  FEDERAL TRADE COMMISSION,
              Plaintiff,
 5
    Vs.                    Case No. 4:14-CV-00783-DW
 6
 7  CWB SERVICES, LLC, et al.,
 8           Defendants.
 9
10
11
12
           DEPOSITION OF FRAMPTON THEODORE ROWLAND, III,
13  a Defendant, and DEPOSITION OF LONGBOAT GROUP, LLC; ST.
    ARMANDS GROUP, LLC; OREAD GROUP, LLC; VANDELIER GROUP,
14  LLC; ANASAZI SERVICES, LLC; and ANASAZI GROUP, LLC,
    pursuant to Section XX.A of the Stipulated Preliminary
15  Injunction, through their designated representative,
    FRAMPTON THEODORE ROWLAND, III, taken on behalf of the
16  Plaintiff, pursuant to Notice, on the 16th day of
    October, 2014, at the law offices of LATHROP & GAGE LLP,
17  2345 Grand Boulevard, Suite 2200, Kansas City, Missouri,
    before
18
               GAIL L. RIEDE,
19
    a Certified Court Reporter of the State of Missouri.
20
21
22
23
24
25
```

**2**

```
 1  APPEARANCES:
 2  ON BEHALF OF THE FEDERAL TRADE COMMISSION:
        MR. MATTHEW WILSHIRE
 3      MS. LISA A. ROTHFARB
        UNITED STATES FEDERAL TRADE COMMISSION
 4      600 Pennsylvania Avenue, NW
        Washington, DC  20580
 5      (202)326-2602
        mwilshire@ftc.gov
 6
 7  ON BEHALF OF DEFENDANTS FRAMPTON T. ROWLAND, III, and
    RELATED DEFENDANT ENTITIES:
 8      MR. PHILLIP G. GREENFIELD
        ROUSE HENDRICKS GERMAN MAY, PC
 9      1201 Walnut Street, Suite 2000
        Kansas City, Missouri  64106
10      (816)471-7700
        philg@rhgm.com
11  ON BEHALF OF DEFENDANTS TIMOTHY A. COPPINGER and RELATED
    DEFENDANT ENTITIES:
12      MR. R. J. MORRISON
        DENTONS US LLP
13      4520 Main Street, Suite 1100
        Kansas City, Missouri  64111
14      (816)460-2467.
        rjmorrison@dentons.com
15
    ON BEHALF OF THE RECEIVER:
16      MR. BRIAN M. HOLLAND
        LATHROP & GAGE LLC
17      2345 Grand Boulevard, Suite 2200
        Kansas City, Missouri  64108
18      (816)292-2000
        bholland@lathropgage.com
19
20  ALSO PRESENT:
        MR. LARRY E. COOK
21      COOK RECEIVER SERVICES
        15621 West 87th Street Parkway, Suite 136
22      Lenexa, Kansas  66219
23      MR. DANIEL TEMKIN, Paralegal (via telephone)
24
25
```

**3**

```
 1                      STIPULATIONS
 2          It was stipulated by and between counsel and the
 3  witness that the presentment of this deposition to the
 4  witness by the officer is expressly waived.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                    I N D E X
 2
 3  WITNESS:                            EXAMINATION:
 4  FRAMPTON THEODORE ROWLAND, III            7
 5     BY MR. WILSHIRE
 6
 7  EXHIBITS        DESCRIPTION           FOR ID
 8  Number 14  Deposition Notices           7
 9  Number 15  9/8/08 Email to Witness fr Harbour   13
10  Number 16  6/28/07 Emails Witness-Holland   29
11  Number 17  (Withdrawn)                  --
12  Number 18  Email chain                 132
13  Number 19  Memo to Ted from Connor     138
14  Number 20  13 Wk Cash Flow Projs Blue Pine  141
15  Number 21  List of lenders and amounts   157
16  Number 22  List of lenders and amounts   164
17  Number 23  Copies of cashier's checks   176
18  Number 24  Bank documents              179
19
20
21
22
23
24
25
```

193

1   back for him?
2     (The previous question was read by the reporter,
3   as follows:
4     "QUESTION: Okay, so other than what we've
5   already discussed today, have you or anyone in your
6   family received any assets, including money or any kind
7   of benefits, valued over $1,000 from any third party in
8   the last month?")
9     A. So that's -- okay, all right, I misunderstood.
10   I thought the question was outside of family. So I have
11   received money from my mother.
12     **Q. (By Mr. Wilshire) How much?**
13     A. I don't know exactly, I would say approximately
14   35,000.
15     **Q. Does your wife have any bank accounts that are**
16   **where she's the only person on them, not joint with you?**
17     A. Yes.
18     **Q. How many?**
19     A. One.
20     **Q. That account, is that account frozen currently?**
21     MR. GREENFIELD: You unfroze it.
22     **Q. (By Mr. Wilshire) Can you tell us how much money**
23   **is in that account right now?**
24     A. I don't know exactly, but I'm guessing maybe
25

194

1     **Q. Do you have -- do you know your wife's net**
2   **worth?**
3     A. Her net worth?
4     **Q. Yes.**
5     A. (No response.)
6     **Q. Would it be over $_____?**
7     A. Well --
8     **Q. I'm sorry, let me rephrase this question.**
9     **Do you understand the difference between**
10   **joint property and separate property?**
11     MR. GREENFIELD: I was going to say you might
12   want to clarify that.
13     MR. WILSHIRE: Right.
14     A. Yes, I do.
15     **Q. (By Mr. Wilshire) Does she have separate**
16   **property that has a net worth of over $_____?**
17     A. No.
18     **Q. Are her parents still alive?**
19     A. Yes.
20     **Q. Do they have a net worth over $_____?**
21     A. Boy, I don't know. It would probably be right
22   about that if I had to estimate.
23     **Q. How about, do they have a net worth over**
24   **$_____?**
25     A. I don't think so, no.

195

1     **Q. Do you have any siblings?**
2     A. I do not.
3     MR. WILSHIRE: Okay, I think I'm done here, but
4   I want to take five minutes just to confer with my
5   co-counsel and make sure I am not missing anything.
6     (A recess was taken.)
7     MR. WILSHIRE: Let's go back on the record.
8     **Q. (By Mr. Wilshire) Mr. Rowland, you wanted to**
9   **issue a clarification?**
10     A. I do.
11     In your question related to any monies
12   received from a third party in the last 30 days, my
13   partner, DNA, actually, approximately 30 days ago, wired
14   $20,000 to my attorney's firm for defense.
15     **Q. Okay, thank you for that additional information,**
16   **I appreciate that.**
17     **I have two quick additional questions and**
18   **I think we're done.**
19     **One, can you estimate your mother's net**
20   **worth?**
21     A. _____
22     **Q. Second question is, on the person financial**
23   **statement that I showed you that we did not put in the**
24   **record, you indicated that the top line had your**
25   **signature; I asked you if that was your wife's signature**

196

1   **and you said it was not. Do you know who did that?**
2     A. You know, it looks like when I've signed things
3   for her in the past. So I think I probably would have
4   signed it.
5     MR. WILSHIRE: I think we're okay.
6     Did you want to ask any questions?
7     MR. GREENFIELD: No.
8     MR. WILSHIRE: I believe we are off the record.
9     MR. GREENFIELD: We will read and sign.
10     THE REPORTER: Same orders as yesterday?
11     MR. HOLLAND: Yes.
12     MR. MORRISON: Yes.
13     MR. GREENFIELD: Please.
14     (The deposition concluded at 4:10 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Case 4:14-cv-00783-DW   Document 72-1   Filed 05/08/15   Page 64 of 65
For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

197

CERTIFICATE OF WITNESS

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

I hereby certify, under penalty of perjury, that I have affixed my signature hereto on the date so indicated.

DATED:

_____
FRAMPTON THEODORE ROWLAND, III

198

1  WITNESS: FRAMPTON THEODORE ROWLAND, III
2  DATE: October 16, 2014
3  CASE: FTC, vs. CWB Services, et al.
4
5      Please note any errors and the corrections thereof on this errata sheet. The rules require a
6  reason for any change or correction. It may be general, such as "To correct stenographic error," or "To clarify
7  the record," or "To conform with the facts."
8  PAGE LINE CORRECTION    REASON FOR CHANGE

199

1  STATE OF MISSOURI      )
2                         ) SS:
3  COUNTY OF JACKSON      )
4
5      I, Gail L. Riede, a Court Reporter in and for
the State of Missouri, do hereby certify that the above testimony of FRAMPTON THEODORE ROWLAND, III, was recorded on October 16, 2014, and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

GAIL L. RIEDE
MISSOURI SUPREME COURT
CERTIFIED COURT REPORTER

50 (Pages 197 to 199)

Case 4:14-cv-00783-DW   Document 157-1   Filed 05/08/15   Page 65 of 65